## Amburgey v. Commonwealth.

June 6, 1941.

E. B. Rose, of Beattyville, and S. H. Rice for appellant.

Hubert Meredith, Attorney General, and William F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

Cuba Amburgey was convicted of killing Arco Angel and sentenced to two years' confinement in the penitentiary. He has appealed, insisting that the verdict is so flagrantly against the weight of the evidence that we should not permit it to stand, and that the Court should have eliminated the possibility of his conviction of voluntary manslaughter by instructing on murder alone. A summary of the facts is therefore required.

The scene of the shooting was a Holy Roller night tent meeting, at which the exhibition and handling of four rattlesnakes seems to have been the principal attraction. Arco Angel was merely one of the "testifyers" whose part required his presence on the platform, and, except for the fact that he was mortally wounded, his role in the drama appears to have been a minor one. At least, so far as the record shows, he had neither given nor taken offense, but fell victim to passions engendered by an incongruous mixture of religious fervor, avuncular affection, and bad whisky, or, it may have been, as one spectator expressed it, "the devil wouldn't let the Lord work."

The action began when the preacher's eighteen year old son, a nephew of appellant, was bitten by one of the snakes and became so violently ill that he had to be taken home by his mother. Apparently unmoved, or perhaps greatly inspired, his father continued the service. Appellant was not a member of the sect, but nevertheless, was in attendance as a spectator. Whether he had anticipated that he himself might be bitten by the reptiles, and, for that reason, had fortified himself with an ample supply of the popular remedy, does not appear, but, in any event, he was well fortified with at least a half a pint according to his own admission. When he perceived that one of the reptiles had bitten his nephew, he marched down the aisle for the avowed purpose of "killing the G—— D—— snakes," and, on

being prevented from doing so by the deputy sheriff and one or more of his brothers, who agreed to take and keep him away, departed from the scene, only to return a half hour later. Still armed with his pistol and his bottle, and in the company of his brothers and friends, he took up a position outside but near the entrance to the tent. Frustrated in his attempt to emulate St. Patrick, he assuaged his outraged feelings by further imbibing the aforesaid remedy; but what he did thereafter is a matter of grave dispute.

According to eighteen witnesses, some of whom were related to him by blood or marriage, and several of whom claim they were holding him to prevent him from attacking the snakes, he did nothing more than has been related; but, according to Junior McIntosh, a thirteen year old boy who was standing in the entrance, and whose testimony bears the ring of truth, he drew his pistol, correctly described by the witness, and fired three shots in the direction of Arco Angel. The walls of the tent formed a rectangle, and a section of the left side near the end where the platform was located, was rolled up forming an entrance. Another witness for the Commonwealth testified that she saw appellant standing outside the tent with his pistol in his hand immediately after the shots were fired. One or more witnesses testified that the shots came from the group composed of appellant and his friends; and numerous witnesses testified that the sound of the shots came from that direction. The deputy sheriff was standing outside the tent near the middle of its left side, and, upon hearing the shots, "flashed" his eyes around and saw the crowd coming toward him from the left hand corner. He met Dale Amburgey, Mack McIntosh, appellant, and some others "all in a shuffle." One of them said "get that pistol away from him." Appellant was trying to "get loose from them," and the witness, according to his testimony, "walked up and said 'What is the matter, Dale.' Dale had Cuby by the arm and said somebody has killed Arco Angel, to go back behind the tent and get whoever killed Arco that he would take care of Cuby. I went around the corner of the tent and didn't see anybody. They was trying to get Cuby's pistol. I went up and said 'I want his pistol, or I want that pistol' and they said he didn't have any pistol and I asked who got the pistol and he said he didn't know." When it is remembered that appellant admitted that he had his pistol with him

at the time of the shooting, and claimed that Redwine Amburgey, who was one of the group, took it away from him immediately after the shooting, which statement was corroborated by Redwine, and that the pistol was never produced, although its surrender to the deputy sheriff at that time would have disclosed whether or not it had been fired, the significance of the testimony quoted is emphasized.

In addition to the fact that eighteen witnesses testified that appellant did not fire the shots, the following circumstances are urged upon our consideration by his counsel, as establishing his contention that the verdict is flagrantly against the weight of the evidence: Certain contradictions of Junior McIntosh's testimony are pointed out, principally his statement that he saw appellant and a man with whom he was talking immediately before the shooting run through the crowd immediately after it had taken place; but, on cross-examination, Junior said he saw appellant run only a few steps and never saw him thereafter, which does not conflict with the testimony of the deputy sheriff when carefully analyzed, or the statement of those witnesses who saw Cuba in the tent looking at the wounded man several minutes after the shooting. Numerous witnesses who did not see the shots fired testified that the sound of the shots came from a point outside either the right hand corner or back of the tent, and a few of them claim to have seen flashes. Some testified as to bullet holes in the back of the tent near the right hand corner. But it is obvious that a concerted effort was being made by a group of interested persons to save appellant at all hazards, and it is impossible to accept the testimony of the witnesses who claim to have seen gun flashes in the rear of the tent, or to have found bullet holes therein which were occasioned by the fatal shooting, without discrediting the positive testimony of Junior McIntosh, or closing our minds to the almost inescapable deductions to be drawn from appellant's belligerent attitude and previous conduct, as well as from his failure to produce his pistol, and the effort of his brother, Redwine, to prevent the deputy sheriff from taking possession of and examining it. Several shots were fired on the road some time after the shooting of Angel and after appellant had entered the tent to inspect his victim, and while he was still on the scene. The inference is drawn by appellant's counsel that the actual killer was the person who subse-

quently fired the shots on the road, but it requires no stretch of the imagination to conceive that the shots from the road were fired by one or more of appellant's adherents in furtherance of the design which had caused them to mislead the deputy sheriff with respect to appellant's possession of the pistol. Suspicion is sought to be cast upon one or more members of the Johnson family, of which Junior McIntosh is a member, but aside from the fact that they came to the meeting from Breathitt County, no cause for the suspicion is suggested. Great stress is laid by appellant's counsel upon the fact that the bullet which struck Angel entered the center of the left side of his back, ranged slightly upward toward the right, and came out just above the navel, which fact, if Angel had been squarely facing the audience, as many of the witnesses testified, would demonstrate that the fatal shot was fired from the back or right hand corner of the tent. But Angel was constantly moving about, and it is entirely possible that he was momentarily facing the right at the time the shot was fired.

To attempt a detailed recitation or exhaustive analysis of the testimony would require an opinion of unreasonable length. It should be sufficient to say that we have carefully read and re-read the testimony but with only one result, namely: While appellant's innocence is testified to by numerous witnesses and completely established, if their testimony is to be believed, his guilt is clearly shown by the unshaken testimony of at least one witness whose testimony is consistent with the deductions which may legitimately be drawn from appellant's admitted acts. To our regret, the physical facts shown in evidence are not controlling, either because of the character of evidence by which some of them are sought to be established, or because of contradictions in the testimony which necessarily vary the conclusions which might be drawn therefrom. We cannot say either that there was not sufficient evidence to support the jury's verdict, or that it was so flagrantly against the weight of the evidence as to indicate passion or prejudice. To do so, would be an unjustifiable usurpation of the jury's function since it was the sole judge of the credibility of the witnesses upon whose veracity the issue inevitably hinged. Gooslin v. Commonwealth, 283 Ky. 665, 142 S. W. (2d) 989.

The argument that the Court erred in instructing on

voluntary manslaughter, as well as murder, is, perhaps, best answered by the uncontrovertible statement that had it not done so, reversible error would have been committed. Greer v. Commonwealth, 111 Ky. 93, 63 S. W. 443; Cook v. Commonwealth, 262 Ky. 718, 91 S. W. (2d) 25. It is true that Junior McIntosh said that appellant "fired at Arco," but that he meant merely that he had fired in the direction of Arco seems to us probable from the context:

"Q. Did he take aim at anything? A. No, sir. He just threw up his gun and shot three shots in the tent.

"Q. What at? A. Fired at Arco."

Theoretically there may not have been enough evidence to justify an instruction on murder, but certainly the Commonwealth's testimony established a typical case of voluntary manslaughter, at least that type of it which results from the reckless and unlawful use of dangerous instrumentalities. Embry v. Commonwealth, 236 Ky. 204, 32 S. W. (2d) 979; Roberson's New Kentucky Criminal Law and Procedure, 2d Ed., Section 372, p. 494. The ingenious argument of appellant's counsel is that the lightness of the penalty imposed indicates that the jury had doubts as to appellant's guilt, and would have acquitted him rather than convict him of murder, and hence the instruction on manslaughter was prejudicial. But whether he would or could have been convicted of murder, we need not attempt to determine, since, clearly, he was properly convicted of voluntary manslaughter if the facts of the killing were as related by the Commonwealth's witnesses. Russell v. Commonwealth, 276 Ky. 38, 122 S. W. (2d) 1009.

Finally it is urged as a ground for reversal that the Commonwealth's Attorney was guilty of improper argument to the jury when he said:

"If the defendant didn't kill him and someone else did, then it was up to the defendant to show who killed him."

It may be conceded that this argument was improper, but it appears that upon its repetition followed by another objection and a motion to set aside the swearing of the jury, the Court admonished the jury as follows:

"Gentlemen of the jury the statement of the Commonwealth's Attorney that if the defendant didn't kill him and someone else did, it was up to him to show it, will not be considered by you for any purpose."

We cannot conceive that with this admonition from the Court in mind, the jury could have been influenced by the objectionable argument to disregard the Court's positive instruction to find the appellant "not guilty" if they entertained a reasonable doubt of his having been proven guilty. Puckett v. Commonwealth, 235 Ky. 340, 31 S. W. (2d) 383.

Judgment affirmed.