## Lawson et al. v. Commonwealth.

Oct. 2, 1942.

438

R. L. Pope and C. B. Upton for appellant.

Hubert Meredith, Attorney General, and Jesse K. Lewis, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Tilford—Affirming.

The appellants were jointly indicted, convicted, and fined for violating Chapter 60 of the Acts of the 1940 General Assembly, Kentucky Statute, Sec. 1267a-1 which is as follows:

"No person shall display, handle or use any kind of snake or reptile in connection with any religious service or gathering.

"(a) Any person violating the provisions of this Act shall be guilty of a misdemeanor and punished by a fine of not less than $50.00 nor more than $100.00."

The constitutionality of the Act is challenged as well as the interpretation placed upon it by the Trial Court. That interpretation is reflected in the Court's refusal to permit proof of the absence of coercion or disturbance during the religious meetings at which snakes were displayed and handled by appellants, and its refusal to permit appellants to read to the jury the scriptural passages upon which they base their beliefs and practices. Since neither breach of the peace nor the intent of the violator is an element of the offense denounced, it is obvious that the interpretation placed upon the Statute by the Court was correct, and that the only actual question necessary to be considered on this motion for an appeal is the Statute's constitutionality.

Many snakes are poisonous, and only the zoologist, herpetologist, or experienced woodsman is able to distinguish those which are not. Hence the suggestion that the enactment of the Statute was not a legitimate exer-

cise of the State's police power because certain species of snakes are harmless and their handling and exhibition unattended by danger, is ineffectual. Legislation enacted by a state in the exercise of its police power may not be invalidated because included among the prohibited articles or acts are some, which, perchance, may be harmless, where only experts can distinguish between them and the public, for whose protection the legislation is enacted, is unable to do so. Notoriously, religious services or gatherings are not conducted by herpetologists, and rather than entrust the selection of the types of snakes to be displayed and handled at such meetings to the inexpert and thus imperil the lives of the participants, the Legislature had the right, unless forbidden by the State or Federal Constitution from so doing, to prohibit the practice altogether. Moreover, there is no pretense that the snakes handled or exhibited by the appellants were nonpoisonous, since the very purpose sought to be accomplished by their handling was to demonstrate appellants' immunity, through faith, to the fatal consequences which would ensue to those who possessed it not.

Appellants' main contention is that since they believe that the handling of snakes is a test of their faith, and it is part of their religious belief and practice, the Statute which would penalize the practice is violative of the freedom of religion guarantees contained in the Federal and State Constitutions. Thus it becomes necessary to examine the language of the constitutional guarantees and the circumstances which led to their enactment.

Except for the provision of Article 6 that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States," the Federal constitution as originally adopted contained no reference to the subject; but that the people had determined to remain free of the ecclesiastical yoke which had been fastened upon them throughout the major portion of their colonial history through the union of Church and State, is evidenced by the third of a series of twelve amendments proposed by the first Congress in 1789, which constitutes the first of the ten actually adopted. The amendment forbade Congress to establish a religion or prohibit the free exercise thereof; and not until 1868, through the adoption of the fourteenth amendment,

which makes no direct reference to the subject, was there a Federal guarantee of religious freedom directed to the individual.

"The fundamental concept of liberty embodied in that Amendment embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,— freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. No one would contest the proposition that a state may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guaranty. It is equally clear that a state may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment."

We have quoted the foregoing excerpt from the opinion of the Supreme Court in the case of Cantwell et al. v. State of Connecticut, 310 U. S. 296, 60 S. Ct. 900,

903, 84 L. Ed. 1213, 128 A. L. R. 1352, decided in 1940, not only because it shows the source of the Federal protection of the individual's religious freedom, but because it aptly sets forth the limitations upon the individual's right to act in exercising it, namely, the power of the state to regulate the times, places, and manner of its exercise when such regulation is necessary for the safeguarding of the health, good order, and comfort of the community. In the more recent case of Jones v. City of Opelika, combined with two other cases and reported in 62 S. Ct. 1231, 1237, 86 L. Ed. —, the Supreme Court reiterated these principles, saying with respect to the constitutional guarantees:

"They are not absolutes to be exercised independently of other cherished privileges, protected by the same organic instrument. Conflicts in the exercise of rights arise and the conflicting forces seek adjustments in the courts, as do these parties, claiming on the one side the freedom of religion, speech and the press, guaranteed by the Fourteenth Amendment, and on the other the right to employ the sovereign power explicitly reserved to the State by the Tenth Amendment to insure orderly living without which constitutional guarantees of civil liberties would be a mockery. Courts, no more than Constitutions, can intrude into the consciences of men or compel them to believe contrary to their faith or think contrary to their convictions, but courts are competent to adjudge the acts men do under color of a constitutional right, such as that of freedom of speech or of the press or the free exercise of religion and to determine whether the claimed right is limited by other recognized powers, equally precious to mankind. So the mind and spirit of man remain forever free, while his actions rest subject to necessary accommodation to the competing needs of his fellows."

See, also, Davis v. Beason, 113 U. S. 333, 342, 10 S. Ct. 299, 33 L. Ed. 637; Minersville School District et al. v. Gobitis et al., 310 U. S. 586, 60 S. Ct. 1010, 84 L. Ed. 1375, 127 A. L. R. 1493; Reynolds v. United States, 98 U. S. 145, 166, 25 L. Ed. 244. From these decisions and others of the Supreme Court it is apparent that the Federal Constitution does not preclude a state from enacting a law prohibiting the practice of a religious rite

which endangers the lives, health or safety of the participants, or other persons. As said by Chief Justice Waite in the Reynolds case, supra:

> "Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pire of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?"

That the preservation of their religious freedom for which they had long struggled was of vital concern to the Colonists is evidenced by the fact that prior to the adoption of the First Amendment to the Federal Constitution, New York, Pennsylvania, New Hampshire, Virginia, and North Carolina had proposed amendments to the original document with that end in view. That it was thought that they had accomplished their object, so far as the Federal Government was concerned, is evidenced by the fact that the treaty with Tripoli, signed by President Washington and approved by the Senate in 1797, 8 Stat. 154, contains the statement:

> "The government of the United States of America is not in any sense founded on the Christian religion." Art. 11.

To protect themselves from local interference with their religious freedom, they incorporated variously worded provisions in their state constitutions. That these were not designed to prevent the states from prohibiting practices inimicable to the safety and rights of others, but were intended solely to insure their own right to believe as their consciences dictated is patent from the decisions construing them. As Colonists, with the exception of those who resided in Maryland, Rhode Island, and Pennsylvania, they had been subjected to punishment for nonconformance with the established religions, the punishments ranging from fines, whippings, and the pillory, to torture, exile and the gallows. As an example we quote the following, probably the first of the Blue Laws, enacted in 1610 at the behest of the Church of England for the goverance of the Colony of Virginia:

"Every man and woman shall repair in the morning to the divine service and sermons preached upon the Sabbath Day, and in the afternoon to divine service and catechizing, upon pain for the first fault to lose their provision and the allowance for the whole week following; for the second, to lose the said allowance and also to be whipped; and for the third to suffer death."

Almost every deviation from the established practice or faith constituted a crime. In Maryland and Pennsylvania it was only toleration that was guaranteed, and that only "to persons professing to believe in Jesus Christ." From these abuses they sought relief, not the right, under the guise of religious freedom, to jeopardize the safety, health, or welfare of their fellowman. The reader who desires to pursue the historical inquiry further is referred to the following sources: Bancroft—"History of the Formation of the Constitution," and "History of the United States;" Adams—"The Emancipation of Massachusetts;" Backus—"Church History of New England;" Besse—"Sufferings of the Quakers;" Baird—"Religion in America;" Fiske—"Beginnings of New England;" Trumbull—"Blue Laws, True and False."

Obviously, any recitation of the constitutional provisions and their interpretations would be impossible in an opinion of reasonable length. Their object, however, is clearly discernible from the enacting clause of "An Act for Establishing Religious Freedom" written by Thomas Jefferson, the leading exponent of the cause, adopted by the Virginia House of Assembly, on December 26, 1785:

"Be it therefore enacted by the General Assembly that no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess; and by argument to maintain, their opinions in matters of religion, and that the same shall in nowise diminish, enlarge, or affect their civil capacities." Blakely's American State Papers, pp. 23 to 26.

The writings of Jefferson are too voluminous to per-

mit of detailed scrutiny, but his views on the particular subject of inquiry have been thus accurately summarized by Chief Justice Gibson of the Supreme Court of Pennsylvania in the case of Commonwealth v. Lesher, 17 Serg. & R. 155. at page 161:

"He denies the right of society to interfere, only where society is not a party in interest, the question, with its consequences, being between the man and his Creator; but as far as the interests of society are involved, its right to interfere, on principles of self-preservation, is not disputed. And this right is insolvable into the most absolute necessity; for, were the laws dispensed with, wherever they happen to be in collision with some supposed religious obligation, government would be perpetually falling short of the exigence."

The provision guaranteeing religious freedom incorporated in Kentucky's first Constitution, adopted April 19, 1792, is in the following language:

"That the general, great, and essential principles of liberty and free government may be recognized and unalterably established, we declare * * *.

"3. That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no man of right can be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; that no human authority can in any case whatever control or interfere with the rights of conscience; and that no preference shall ever be given by law to any religious societies or modes of worship." Art. 12, secs. 1, 3.

The same language appears in the second Constitution adopted August 17, 1799, art. 10, sec. 3, and in the third Constitution adopted June 11, 1850, art. 13, sec. 5. The language of the present Constitution is as follows:

"No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to

any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in any wise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience." Sec. 5.

In the light of the historical background which we have attempted to sketch, it is apparent that the framers of these Constitutions were imbued with the ideals of Thomas Jefferson and had no thought of depriving the legislature of its inherent power to legislate for the welfare and safety of its citizens.

This Court has not been previously called upon to discuss at length the meaning of these constitutional provisions, but in the case of Delk v. Commonwealth, 166 Ky. 39, 178 S. W. 1129, 1132, L. R. A. 1916B, 1117, Ann. Cas. 1917C, 884, which was an appeal by a minister from a fine imposed upon him for using in his sermon to a large audience suggestive language calculated to disturb the public peace, we said:

"The appellant's excuse that he was merely rebuking the sin of impurity, that he did not intend to disturb or embarrass any one, but made the statement as a warning and rebuke to sin, is wholly without justification. It does not avail appellant for him to say he has a right to propagate his religious views. That right is not denied; but one will not be permitted to commit a breach of the peace, under the guise of preaching the gospel. If one be licensed to use the pulpit for such disgraceful performances as the appellant admits he was guilty of in this case, then women and children are to be insulted with impunity by the use of the most obscene vulgarity in places where they go to worship."

If the State may punish a preacher for using language calculated to insult and offend the sensibilities of a congregation and thus breach the peace, preachers and members of his congregation may be prohibited by penal statutes from committing acts which are calculated to endanger the safety and lives of themselves and others. The likely results of such exhibitions are well illustrated by the facts disclosed in the case of Amburgey v. Com-

monwealth, 287 Ky. 421, 153 S. W. (2d) 918. Many cases from other states substantiating the principles enunciated could be cited if space permitted our so doing, among them, City of Wilkes-Barre v. Garabed, 11 Pa. Super. 355, and People v. Pierson, 176 N. Y. 201, 68 N. E. 243, 246, 63 L. R. A. 187, 98 Am. St. Rep. 666. In the former an ordinance prohibited the use of drums or other musical instruments on the streets without permit from the mayor, and its constitutionality was attacked by members of the Salvation Army on the ground that it transgressed their right to worship according to the dictates of their own consciences. In the Pierson case, the constitutionality of a statute which required parents to furnish medical attention to their children was attacked by a defendant who had adopted a child who had died from pneumonia without having been attended by a physician. He defended on the ground that he belonged to a religious group which believed in Divine healing, through prayer. Said the Court in upholding the constitutionality of the Statute:

"The peace and safety of the state involve the protection of the lives and health of its children, as well as the obedience to its laws. Full and free enjoyment of religious profession and worship is guarantied, but acts which are not worship are not."

Other cases of similar import may be found in the footnotes to Sections 206a and 206b, "Constitutional Law" 16 Corpus Juris Secundum, pages 599 to 603, from which we quote the following excerpt:

"Laws enacted for the purpose of restraining and punishing acts which have a tendency to disturb the public peace or to corrupt the public morals are not repugnant to the constitutional guaranties of religious liberty and freedom of conscience, although such acts may have been done pursuant to, and in conformity with, what was believed at the time to be a religious duty. Without violating the constitutional guaranties, the state, under the police power, may enact laws in order to promote the general welfare, public health, public safety and order, public morals, and to prevent fraud."

The appeal is granted and the judgment affirmed.

Whole Court sitting.