STATE of Tennessee ex rel. Henry F. SWANN, District Attorney General, Petitioner,

v.

Liston PACK, Pastor of the Holiness Church of God in Jesus' Name, et al., Respondents.

Supreme Court of Tennessee.

Sept. 8, 1975.

R. A. Ashley, Jr., Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., Nashville, Henry F. Swann, Dist. Atty. Gen., for petitioner.

Edward Michael Ellis; Knoxville, Theo J. Emison, Jr., Alamo, for respondents.

## OPINION

HENRY, Justice.

We granted certiorari in this case to determine whether the State of Tennessee may enjoin a religious group from handling snakes as a part of its religious service and in accordance with its Articles of Faith, on the basis of such action constituting a public nuisance.

The Circuit Court at Newport permanently enjoined the defendant, Pack, Pastor of The Holiness Church of God in Jesus Name, of Newport, and one of his Elders from "handling, displaying or exhibiting dangerous and poisonous snakes", predicating its action primarily upon a finding that "the handling of said dangerous and poisonous snakes is in violation of T.C.A. § 39–

2208[1] and that said practice is done in the presence of children and other people attending church services. . . .".

The Court of Appeals, in a split decision, found the injunction to be overbroad and modified it to read that the respondents

are permanently enjoined from handling, displaying or exhibiting dangerous and poisonous snakes in such manner as will endanger the life or health of persons who do not consent to exposure to such danger.

Petitioner assigns a single error, viz.:

The Court of Appeals erred in holding that the State could not completely enjoin violations of T.C.A. § 39–2208 as common law public nuisances.

■ As a triggering device to invoke the jurisdiction of this Court, this assignment is sufficient; however, it does not raise the precise issue before the Court for determination. This follows from the basic principle that a common law nuisance is not founded on any statute and a public nuisance may exist with or without statutory predicate. While other questions lurk in the record, we deem the critical and controlling issue to be as set forth in the opening sentence of this opinion.

I.

To place this controversy in proper perspective, we note the pleadings and trial proceedings.

On April 14, 1973, the District Attorney General of the Second Judicial Circuit filed his petition in the Circuit Court at Newport charging that respondents Pack and certain designated Elders, including Albert Ball, had been handling snakes as a part of their church service "for the last two years";

1. Section 39–2208 reads as follows:

*Handling snakes so as to endanger life—Penalty.*—It shall be unlawful for any person, or persons, to display, exhibit, handle or use any poisonous or dangerous snake or reptile in such a manner as to endanger the life or health of any person.

that this was one of the rituals of the church to test the faith and sincerity of belief of church members; that Pastor Pack "has become anointed", along with other members of the church and has "advanced" to using deadly drugs, to wit, strychnine; that at a church service on April 7, 1973 snakes were handled and an "Indian boy was bitten and his arm became swollen"; that two named church members drank strychnine and died as a result; that, at the funeral of one of these, Pastor Pack, and others, handled snakes; and that Pastor Pack has proclaimed his intentions to continue these practices. The prayer was for an injunction enjoining respondents "from handling, displaying, or exhibiting poisonous snakes or taking or using strychnine or other poisonous medicines." In the alternative, and upon failure of the named defendants to cease and desist, petitioner prayed that the church be padlocked as a public nuisance.

By order entered April 21, 1973, the trial court found these facts to be true; that § 39–2208 had been violated and ordered that the defendants be

(e)njoined from handling poisonous snakes or using deadly poisons in any church service being conducted in said church or at *any other place in Cocke County, Tennessee* until further orders of the Court. (Emphasis supplied).

Why the judge of a court having personal jurisdiction of the parties and state-wide jurisdiction of the subject matter elected to permit these defendants to practice snake handling as a part of their religious worship in ninety-four counties of the state and deny them the same identical right in the remaining county is not clear.

Any person violating the provisions of this section shall be guilty of a misdemeanor and punished by a fine of not less than fifty dollars ($50.00) nor more than one hundred and fifty dollars ($150), or by confinement in jail not exceeding six (6) months, or by both such fine and imprisonment, in the discretion of the court.

Moreover the record reflects that immediately following the above quoted language the trial judge added, in his own handwriting, the following:

> However, any person who wishes to swallow strychnine or other poison may do so if he does not make it available to any other persons.

The further result of this order was that defendants could not practice snake handling, from which death *might* ensue[2] but could drink strychnine, a highly poisonous drug.[3]

The record reflects no explanation for this incongruity.

Thereafter, the District Attorney General filed a second petition alleging stepped up activity, at the Holiness Church. On July 1, 1973, "a national convention for the snake handlers' cult of the United States" was held and "many dangerous and poisonous snakes were displayed" and one of the handlers had been bitten and was in a Chattanooga hospital recuperating.[4] Services were conducted on July 3 and July 7, 1973, and again snakes were handled. All this led the District Attorney General to conclude and charge that Cocke County was in imminent danger and likely to "become the snake handling capital of the world".

In response to this citation, respondents were held in contempt, fined and sentenced, but sentences were suspended in each case, "until the said defendant handles poisonous snakes at said church are (sic) any other place *in Cocke County, Tennessee.*"

Up to this point defendants had not been represented by counsel.

2. The most common question that arises regarding ritual snake handling is the surprisingly small number of fatalities. L. M. Klauner, "the undoubted authority on the rattlesnake" writes that the fatalities from this cause (rattlesnake bite) for the entire United States, with a population of over 160 million, seldom exceed 30 per year. Of every 100 people bitten by rattlesnakes, only about 3 will die. W. LaBarre, They Shall

By order entered August 18, 1973 respondents were jailed in default of payment of the fines theretofore imposed and directed to appear on August 25, 1973 to show cause why they should not be required to serve the sentences.

The hearing was conducted on August 25, 1973 and September 27, 1973. There is no substantial factual dispute between the parties. In fact the entire factual situation is dependent upon the pleadings, the testimony of one witness, various stipulations and exhibits.

It was stipulated that various witnesses would testify that they had never seen anyone other than designated representatives of this particular church handle snakes; that they never saw any person who was either a parishioner or a nonmember present at the church services who had ever been placed in immediate danger.

It was further stipulated that an anthropologist would testify that snake handling is a legitimate part of their religious service; that she had never seen anyone endangered by handling snakes; that proper precautions were always taken; and that handling snakes is a legitimate and historic part of the church service. Two other witnesses would verify this testimony.

It was further stipulated that the "Indian boy", bitten at one of the services, was thirty years old.

It was further stipulated that the Holiness Church of God in Jesus Name is located about a half mile from the nearest paved road, and at the end of a dead-end, dirt, private, mountain road and on property owned by the church.

Take up Serpents, pp. 13–14 (University of Minnesota Press 1962), (hereinafter referred to as LaBarre).

3. See Dorland's Medical Dictionary; Stedman's Medical Dictionary.

4. For a graphic presentation of this meeting, designated as a "homecoming", see Pelton and Carden, Snake Handlers (1974), (hereinafter referred to as Pelton and Carden).

The issues were not fully developed and the record is meager.

The State made no contention that this is not an organized religious group nor did it question that the practice of handling snakes was a recognized part of its Articles of Faith, nor did it question the sincerity of the conviction of the respondents.

By final decree the trial judge made the injunction permanent, directing that defendants "be perpetually enjoined from handling, displaying or exhibiting dangerous and poisonous snakes at the said Holiness Church of God in Jesus Name, or at any other place in Cocke County, Tennessee."

## II.

The history and development of the Holiness Church is relevant.

The Mother Church [5] was founded in 1909 at Sale Creek in Grasshopper Valley, Tennessee, approximately thirty-five miles northeast of Chattanooga, by George Went Hensley. Hensley was motivated by a dramatic experience which occurred atop White Oak Mountain on the eastern rim of the valley during which he confronted and seized a rattlesnake which he took back to the valley and admonished the people to "take up or be doomed to eternal hell." [6]

Hensley, and his followers, based their beliefs and practices on Mark 16, verses 17 and 18, which in the Authorized or King James version, read as follows:

And these signs shall follow them that believe; in my name shall they cast out devils; and shall *speak with new tongues; They shall take up serpents;* and if they *drink any deadly thing,* it shall not hurt them, they shall lay hands on the sick, and they shall recover. (Italics ours) [7]

The church Hensley [8] founded spread throughout the south and southeast and continues to exist today, primarily in rural and relatively isolated regions throughout this area. The Holiness Church of God in Jesus Name, in Cocke County, is a part of this movement. LaBarre, in *They shall Take Up Serpents,* asserts that "(t)he roots of the movement lie deep in American religious history" and asserts that it is one of the "offshoots of Methodism." Writers seem to be in general agreement that it is a "charismatic sect, or cult, or group of the Pentecostal variety." [9]

To say that this is not a conventional movement would be a masterpiece of understatement. Its beliefs and practices are, to say the least, unconventional and out of harmony with contemporary customs, mores and notions of morality. They oppose drinking (to include carbonated beverages, tea and coffee), smoking, dancing, the use of cosmetics, jewelry or other adornment. They regard the use of medicine as a sure sign of lack of faith in God's ability to cure the sick and look upon medical doctors as being for the use of those who do

---

5. The Dolly Pond Church of God With Signs Following. Collins, Tennessee Snake Handlers, page 1 (1947), (hereinafter referred to as Collins).

6. Ibid, p. 2.

7. Both the Old and New Testaments, however, contain language which would appear to be injunctions against snake handling and speaking in tongues. In Ecclesiastes (King James version) 10:11, it is said: "Surely the serpent will bite without enchantment, and a babbler is no better." St. Paul warns the Corinthians, in his First Epistle (Ch. 10, Verse 9) "Neither let us tempt Christ, as some of them also tempted, and were destroyed of serpents."

8. Hensley remained active in the ministry of the church for some forty-six years. He said he had been bitten four hundred times "till I'm speckled all over like a guinea hen." (LaBarre, page 45) This founder and prophet of the church died, refusing medical attention, as a result of being bitten by a diamondback rattlesnake during a prayer meeting at Lester's Shed near Altha, Florida, on Sunday night, July 24, 1955 (Ibid., page 48).

9. Ibid., page 29; E. Clark, The Small Sects in America, pages 23, 85 (Rev. ed. 1949).

not trust God. When greeting each other, the men use the "holy kiss", a mouth-to-mouth osculation "accompanied by a vigorous, if not passionate hug." The "holy kiss" is not exchanged between members of the opposite sexes.[10]

But it is their belief in handling serpents that has catapulted them into the limelight and has produced their legal difficulties.

There is some apparent confusion with respect to their purpose in the use of serpents as a central practice in their religious beliefs. *Harden et al. v. State,* 188 Tenn. 17, 216 S.W.2d 708 (1948) treated snake handling as being "the test and proof of the sincerity of their belief." In this record it is asserted that the use of serpents is designed as a test of the faith and sincerity of church members. Our research indicates that this is not precisely correct. Their basic reason is compliance with the scripture as they interpret it, and as required by their Articles of Faith. But the practice of snake handling is not a test of faith, nor proof of godliness. Its sole purpose is to "confirm the word". In the words of Alfred Ball, a defendant to this suit:

> We don't take up serpents, handle fire or drink strychnine to test the faith of the people at all. That's not the point of it, . . . These are signs that God said would follow the believers. And, these signs, are to confirm the Word of God, and that's the only purpose for them . . . They're not to test the faith of the person doing it. They're not to test whether he's a good person. It's simply and only to confirm the Word of God. That's all God intended the signs for, and that's the only reason we do them.[11]

Pastor Pack states:

What serpent handling's for anyway is to confirm the Word.[12]

Whether the practice is to "test the faith", is not relevant to this controversy. We only make the distinction in the interest of an accurate and comprehensive statement of the beliefs of this religious group and its admittedly unusual ritual.

We should point out that the snakes are supplied by "sinners" or "sinner men" or unbelieving "sinner boys" or "unbelievers." [13]

Lastly, it should be pointed out that snakes are only handled when the member or handler has become "anointed". As we understand this phenomenon and the emotional reaction it produces, it is something akin to saying that a member doesn't handle snakes until the "spirit moves him". Unquestionably this is an emotional stimulus produced by extreme faith and generating great courage. Perhaps the whole belief in "anointment" can best be summed up by the defendant, Liston Pack:

> When I become anointed to handle serpents, my hands get real numb. It is a tremendous feeling. Maybe symbolic to an electric shock, only an electric shock could hurt you. This'll be pure joy.

> \*     \*     \*     \*     \*     \*

> It comes from inside . . . If you've got the Holy Ghost in you, it'll come out and nothing can hurt you. Faith brings contact with God and then you're anointed. It is not tempting God. You can't tempt God by doing what He says do. You can have faith, but if you never feel the anointing, you had better leave the serpent alone.[14]

Such is the nature of the religious group with which we deal.

**10.** This is a composite based upon: Collins, pages 4 & 5; LaBarre, pages 16 & 17; Callahan, Smoky Mountain Country, pages 91–95 (1952).

**11.** *Pelton & Carden,* page 22, 1974. See also pages 24 and 25.

**12.** Ibid.

**13.** LaBarre, page 23; The American Imagination at Work, Clough, page 156 (1947), containing an article by K. Kerman, Rattlesnake Religion, selected and edited by Lealon N. Jones.

**14.** Pelton & Carden, page 32.

### III.

■ Again, this is not a conventional religious group and its members are few. There is, however, no requirement under our State or Federal Constitution that any religious group be conventional or that it be numerically strong in order that its activities be protected. Nor is there any requirement that its practices be in accord with prevailing views.

The First Amendment to the Constitution of the United States requires in clear terms that:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . .

Article 1, Section 3 of the Constitution of Tennessee contains a substantially stronger guaranty of religious freedoms. It provides:

That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship.

■ A "mode of worship", even of a religious group wherein the handling of serpents is central to its Articles of Faith, is constitutionally protected under the Constitutions of Tennessee and of the United States.

In his original draft of the Virginia Act Establishing Religious Liberties, Thomas Jefferson, postulated, *inter alia*:

No man is a competent judge of the religion of another.

Under our constitutions, a citizen may be a devout Christian, a dedicated Jew or a consummate infidel—or he may be a member of the Holiness Church of God in Jesus Name. The government must view all citizens and all religious beliefs with absolute and uncompromising neutrality. The day this Country ceases to countenance irreligion or unusual or bizarre religions, it will cease to be free for all religions. We must prefer none and disparage none.

We, therefore, hold that the Holiness Church of God in Jesus Name, is a constitutionally protected religious group.

■ This is not to say; however, that this or any other religious group has an absolute and unbridled right to pursue any practice of its own choosing. The right to believe is absolute; the right to act is subject to reasonable regulation designed to protect a compelling state interest. This belief-action dichotomy has been the subject of numerous decisions of the Supreme Court of the United States.

### IV.

An early case dealing with the belief-action dichotomy is *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878), wherein the defendant, a member of the Church of Jesus Christ of Latter-Day Saints, commonly called the Mormon Church, was indicted for polygamy and defended upon the ground that, under his religious faith, it was his duty to practice polygamy. In disposing of this contention and in holding that a religious belief cannot be a justification for a criminal violation, the Court said:

Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?

So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances. 98 U.S. 166, 167.

This philosophy was further refined and advanced in *Davis v. Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890), wherein the Court said:

The first amendment to the constitution, in declaring that congress shall make no law respecting the establishment of religion or forbidding the free exercise thereof, was intended to allow every one under the jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose as may be approved by his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect. . . . It was never intended or supposed that the amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society. 133 U.S. 342, 10 S.Ct. 300.

It is assumed by counsel of the petitioner that, because no mode of worship can be established, or religious tenets enforced, in this country, therefore any form of worship may be followed, and any tenets, however destructive of society, may be held and advocated, if asserted to be a part of the religious doctrines of those advocating and practicing them. But nothing is further from the truth. While legislation for the establishment of a religion is forbidden, and its free exercise

permitted, it does not follow that everything which may be so called can be tolerated. Crime is not the less odious because sanctioned by what any particular sect may designate as "religion." 133 U.S. at 345, 10 S.Ct. at 301.

In *Cantwell v. State of Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Court succinctly stated the belief-action doctrine and simultaneously recognized the delicate balance which must be preserved, in these words:

Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. 310 U.S. 303, 304, 60 S.Ct. 903.

This was the first case to apply the "clear and present danger doctrine" in the context of First Amendment freedoms of religion, vis-a-vis a "substantial interest of the state." In this respect the Court said:

When *clear and present danger* of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious. (Emphasis supplied) 310 U.S. 308, 60 S.Ct. 905.

The words of the late Chief Justice Hughes, writing for the Court in *Cox v. State of New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) are pertinent:

Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. 312 U.S. 574, 61 S.Ct. 765.

In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), the Supreme Court had under consideration a resolution of a state board of education requiring that children, in public schools, salute the American Flag. Members of Jehovah's Witnesses objected on the grounds that under their religious teachings the flag is an "image" within the prohibition of the commandment against graven images. In holding that the state could not validly enforce such a requirement the Court observed that First Amendment freedoms "are susceptible of restriction only to prevent *grave and immediate* danger to interests which the state may lawfully protect". The Court said, *inter alia:*

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . . 319 U.S. 642, 63 S.Ct. 1187.

In *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), the Court said of the First Amendment freedoms:

> (A)ny attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by *clear and present danger*. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the *gravest abuses, endangering paramount interests,* give occasion for permissible limitation. (Italics ours). 323 U.S. 530, 65 S.Ct. 322.

In *Harden et al. v. State, supra,* this Court was confronted with a challenge to the constitutionality of Chapter 89, Public Acts of 1947 (now § 39–2208, T.C.A.), on the basis of its alleged violation of the Freedom of Religion Clauses of the State and Federal Constitutions. After citing the belief-action dichotomy of *Cantwell, supra,* certain of the dicta in *Reynolds, supra,* and the "grave and immediate danger" doctrine of *Barnette, supra,* the Court said:

> It is equally certain that this danger is grave and immediate when and wherever the practice is being indulged. 216 S.W.2d at 711.

> ❖    ❖    ❖    ❖    ❖    *

> They may believe without fear of any punishment that it is right to handle poisonous snakes while conducting religious services. But the right to practice that belief "is limited by other recognized powers, equally precious to mankind." (Citation omitted). One of those equally as precious rights is that of society's protection from a practice, religious or otherwise, which is dangerous to life and health. Id.

There cannot be any question that the Court acted upon acceptable legal principles and precedents in declaring the Tennessee Snake Handler's Act constitutional in the face of an attack based upon the Freedom of Religion Clauses of the state and federal constitutions. This is not, however, to say that its application would necessarily be constitutional under all circumstances as is hereinafter pointed out. *Harden* simply holds that the statute does not violate the freedom of religion guarantees of the federal or state constitutions and that the defendants, under the factual situation of that particular case, had handled snakes "in such a manner as to endanger the life or health of any person". Neighboring states having similar statutes have uniformly upheld and applied them.[15]

15. See *Kirk v. Commonwealth,* 186 Va. 839, 44 S.E.2d 409 (1947); *Lawson v. Commonwealth,* 291 Ky. 437, 164 S.W.2d 972 (1942); *Hill v. State,* 38 Ala.App. 404, 88 So.2d 880 (1956); *State v. Massey,* 229 N.C. 734, 51 S.E.2d 179 (1949).

Another relevant Tennessee case is *Gaskin v. State,* 490 S.W.2d 521 (Tenn.1973), wherein this Court held that the Tennessee statute (§ 52–1409, et seq., T.C.A.) relating to the manufacture of marijuana, as applied to the defendants, was not unconstitutional as an infringement of the right to the free exercise of religious faith. The Court relied upon *Reynolds, supra,* and *Harden, supra,* and recognized that the marijuana statutes were adopted to preserve public morals and safety.

A most significant post-*Harden* case is *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) in which the Court's ruling has been characterized as "a new test whereby the burden imposed on an individual because of a restriction on the free exercise of his religion is balanced against the state's interest in controlling the individual's practice of his religion." [16] The Court in *Sherbert* made it clear that the state's interest must be more than rational or colorable in this highly sensitive constitutional area, and that "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." 374 U.S. at 406, 83 S.Ct. at 1795. The Court outlined a two-stage approach, viz.: (1) whether the statute imposes a burden upon the free exercise of religion and (2) whether some compelling state interest justifies the infringement.

The most significant and relevant decision since this Court decided *Harden,* is *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Members of the Amish faith were convicted of violating Wisconsin's compulsory school attendance law by refusing to send their children to school after they had graduated from the eighth grade. Attendance at high school is contrary to the Amish religious faith. The Court affirmed the Wisconsin Supreme Court, holding that their criminal convictions were invalid under the Free Exercise Clause of the First Amendment to the Constitution of the United States. It was stipulated that the defendants' religious beliefs were sincere.

Apropos the case at bar is the following language from the opinion of the Court:

> Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. 406 U.S. at 215, 216, 92 S.Ct. at 1533.

\* . \* \* \* \* \*

Wisconsin concedes that under the Religion Clauses religious beliefs are absolutely free from the State's control, but it argues that "actions," even though religiously grounded, are outside the protection of the First Amendment. But our decisions have rejected the idea that religiously grounded conduct is always outside the protection of the Free Exercise Clause. It is true that activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers. (Citations omitted). But to agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability. (Citations omitted). This case, therefore, does not become easier because respondents were convicted for their "actions" in refusing to send their children to the public high school; in this context belief and action cannot be neatly confined in logic-tight compartments. 406 U.S. at 219, 220, 92 S.Ct. at 1535.

16. 24 Vand.L.Rev. 810 (1971).

The holding of *Yoder* is essentially that permitting the Amish to educate their children, after they have completed the eighth grade, in their own way and in deference to their established religious views, the statutory requirement to the contrary notwithstanding, would not impair the health of the children, nor result in their inability to be self-supporting or to discharge the duties and responsibilities of citizenship, nor in any way materially detract from the welfare of society. Therefore, the Court held that the state's interest was not so compelling as to overrule the freedom of the Amish to pursue their established religious practice.

Respondent urges upon us that the "belief-action" dichotomy was expressly rejected by the Court in *Yoder* and apparently bases this insistence upon the above quoted language. What the Court actually rejected was the "idea that religiously grounded conduct is always outside the protection of the Free Exercise Clause." The consistent holding of the courts has been that belief is *always* protected, but that conduct or action is subject to regulation in the manner and to the extent hereinabove set forth.

The opinion of the Court of Appeals, with respect to *Harden,* reasons that subsequent decisions of the Supreme Court of the United States "have removed the theoretical underpinnings on which the decision was based." The opinion recites:

> The *Harden* decision was premised on the subsequently rejected belief-action dichotomy in free exercise cases, requiring merely a rational relationship between restrictions on religious conduct and the state interest served by the restrictions.

We respectfully differ with our brothers of the Court of Appeals. Without laboring the point, *Harden* was premised on belief-action, but to an equal if not greater extent upon the "clear and present" danger and "substantial interest" doctrine of *Cantwell, supra.*

We read nothing in *Yoder* that would fault the analytic approach of the *Harden*

Court or cause us to reject its reasoning or results.

■ We hold that under the First Amendment to the Constitution of the United States and under the substantially stronger provisions of Article 1, Section 3 of the Constitution of Tennessee, a religious practice may be limited, curtailed or restrained to the point of outright prohibition, where it involves a clear and present danger to the interests of society; but the action of the state must be reasonable and reasonably dictated by the needs and demands of society as determined by the nature of the activity as balanced against societal interests. Essentially, therefore, the problem becomes one of a balancing of the interests between religious freedom and the preservation of the health, safety and morals of society. The scales must be weighed in favor of religious freedom, and yet the balance is delicate.

■ The right to the free exercise of religion is not absolute and unconditional. Nor is its sweep susceptible of discrete and concrete compartmentalization. It is perforce, of necessity, a vague and nebulous notion, defying the certainties of definition and the niceties of description. At some point the freedom of the individual must wane and the power, duty and interest of the state becomes compelling and dominant.

■ Certain guidelines do, however, emerge under both constitutions.

Free exercise of religion does not include the right to violate statutory law.

It does not include the right to commit or maintain a nuisance.

The fact that one acts from the promptings of religious beliefs does not immunize against lawless conduct.

■ But, again, the scales are always weighted in favor of free exercise and the state's interest must be compelling; it must be substantial; the danger must be clear and present and so grave as to endanger paramount public interests.

We decide this controversy in the light of these objectives. In doing so we have not lost sight of the fact that snake handling is central to respondents' faith. We recognize that to forbid snake handling is to remove the theological heart of the Holiness Church and this has prompted this Court to investigate and research this matter with meticulous care and to announce its decision through an unusually extensive opinion.

## V.

We agree with the Court of Appeals that Tennessee's snake handling statute (§ 39–2208 T.C.A.) is not controlling. However, it cannot be ignored. It proscribes, to some extent, the conduct with which we deal. The trial judge based his judgment, in part, upon its violation and, in a very real sense, it represents a part of the public policy of our state, as declared by the legislature.[17]

This statute is not as comprehensive or as conclusive as is generally believed. Nor is it a model of clarity. In material particulars it makes it unlawful

(t)o display, exhibit, handle or use any poisonous or dangerous snake or reptile *in such manner as to endanger the life or health of any person.*

At a glance, it is self-evident that it does not forbid snake handling *per se.*

It condemns the *manner* and not the *fact* of snake handling.

Conversely it permits snake handling if done in a careful and prudent manner or, in the statutory terminology, under any circumstances or in any manner which does not endanger the life or health of any person.

Obviously, it was not intended to prevent zoologists or herpetologists from handling snakes or reptiles as a part of their professional pursuits, nor to preclude handling by those who do so as a hobby, nor those who are engaged in scientific or medical pursuits requiring the handling of snakes.

It is equally obvious that the phrase "any person" must mean any *other* person. If the Legislature had not so intended it would have placed a period at the end of the word reptile, leaving language which made it unlawful "to display, exhibit, handle or use any poisonous snake or reptile." Not having done this one must logically assume that the Legislature was concerned with the *manner* and not the *fact* of snake handling, leaving the zoologist, the herpetologist or anyone else to their own devices subject only to the admonition that their handling must not be done "in such manner as to endanger the life or health of any (other) person." But this is from a standpoint of criminal violations.

Convictions under this statute involve proof of two elements, viz.: (1) that poisonous or dangerous snakes or reptiles were handled and (2) in such manner as to endanger the life or health of any other person. These elements were obviously present in *Harden.*

The trial judge was in error in applying the restricted standard of the statute. This is not a criminal prosecution. Its consequences are more far-reaching and it is to be decided on a substantially different basis.

## VI.

This is a suit to abate a nuisance.

The right of the District Attorney General to institute and maintain such an action inheres in his office. It is his duty to investigate, prosecute and insure against all infractions of the public peace and all acts which are against the peace and dignity of the state.

17. The public policy of the state is to be found in its constitution, statutes, judicial decisions and applicable rules of the common law. *Home Beneficial Assn. v. White,* 180 Tenn. 585, 177 S.W.2d 545 (1944).

We hold that the handling of snakes as a part of a religious ritual is a common law nuisance, wholly independent of any state statute.

In 58 Am.Jur.2d, Nuisances, § 7, a public nuisance is defined as follows:

It is a condition of things which is prejudicial to the health, comfort, safety, property, sense of decency, or morals of the citizens at large, resulting either from an act not warranted by law, or from neglect of a duty imposed by law.

In *Yarbrough v. Louisville and Nashville Ry. Co.,* 11 Tenn.App. 456 (1930) a common law nuisance is defined as follows:

(a) nuisance in legal parlance, extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable or comportable use of property.

Under this record, showing as it does, the handling of snakes in a crowded church sanctuary, with virtually no safeguards, with children roaming about unattended, with the handlers so enraptured and entranced that they are in a virtual state of hysteria and acting under the compulsion of "anointment", we would be derelict in our duty if we did not hold that respondents and their confederates have combined and conspired to commit a public nuisance and plan to continue to do so. · The human misery and loss of life at their "Homecoming" of April 7, 1970 is proof positive.

Our research confirms the general pattern.

Tennessee has the right to guard against the unnecessary creation of widows and orphans. Our state and nation have an interest in having a strong, healthy, robust, taxpaying citizenry capable of self-support and of bearing arms and adding to the resources and reserves of manpower. We, therefore, have a substantial and compelling state interest in the face of a clear and present danger so grave as to endanger paramount public interests.

It has been held that a state may compel polio shots, *McCartney v. Austin,* 57 Misc.2d 525, 293 N.Y.S.2d 188 (Sup.Ct.1968); may regulate child labor, *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); may require compulsory chest x-rays, *State ex rel. Holcomb v. Armstrong,* 39 Wash.2d 860, 239 P.2d 545 (1955); may decree compulsory water fluoridation, *Kraus v. City of Cleveland,* 163 Ohio St. 559, 127 N.E.2d 609 (1955); may mandate vaccinations as a condition of school attendance, *Wright v. Dewitt School District,* 238 Ark. 906, 385 S.W.2d 644 (1965); and may compel medical care to a dying patient, *Application of President and Directors of Georgetown College, Inc.,* 118 U.S.App.D.C. 80, 331 F.2d 1000 (1964).

This holding is in no sense dependent upon the way or manner in which snakes are handled since it is not based upon the snake handling statute. Irrespective of its import, we hold that those who publicly handle snakes in the presence of other persons and those who are present aiding and abetting are guilty of creating and maintaining a public nuisance. Yes, the state has a right to protect a person from himself and to demand that he protect his own life.

Suicide is not specifically denounced as a crime under our statutes but was a crime at the common law.[18] Tennessee adopted the Common Law as it existed at the time of the separation of the colonies. *Dunn. v. Palermo,* 522 S.W.2d 679 (Tenn. 1975). An attempt to commit suicide is probably not an indictable offense under Tennessee law; however, such an attempt would constitute a grave public wrong, and we hold that the state has a compelling interest in protecting the life and promoting the health of its citizens.

Most assuredly the handling of poisonous snakes by untrained persons and the drinking of strychnine are not calculated to increase one's life span.

18. See 40 Am.Jur.2d Homicide, Sec. 583.

## VIII.

The trial judge enjoined the respondents from handling poisonous snakes or using deadly poisons in any church service in Cocke County but authorized the consumption of strychnine.

He erred.

The Court of Appeals modified the injunction so as to enjoin respondents from handling, displaying or exhibiting dangerous and poisonous snakes in such manner as will endanger the life or health of persons who do not consent to exposure to such danger.

There is no reason to restrict the injunction to the terms of the statute, nor is there any occasion for applying a "consenting adult" criterion.

On remand the trial judge will enter an injunction perpetually enjoining and restraining all parties respondent from handling, displaying or exhibiting dangerous and poisonous snakes or from consuming strychnine or any other poisonous substances, within the confines of the State of Tennessee.

At this time it is the view of this Court that no useful purpose would be served by punishing respondents for contempt of court.

We fully appreciate the fact that the decision we reach imposes stringent limitations upon the pursuit of a religious practice, a result we endeavored to avoid. After long and careful analysis of alternatives and lengthy deliberations on all aspects of this problem we reached the conclusion that paramount considerations of public policy precluded less stringent solutions. We gave consideration to limiting the prohibition to handling snakes in the presence of children, but rejected this approach because it conflicts with the parental right and duty to direct the religious training of his children. We considered the adoption of a "consenting adult" standard but, again, this practice is too fraught with danger to permit its pursuit in the frenzied atmosphere of an emotional church service, regardless of age or consent. We considered restricting attendance to members only, but this would destroy the evangelical mission of the church. We considered permitting only the handlers themselves to be present, but this frustrates the purpose of confirming the faith to non-believers and separates the pastor and leaders from the congregation. We could find no rational basis for limiting or restricting the practice, and could conceive of no alternative plan or procedure which would be palatable to the membership or permissible from a standpoint of compelling state interest. The very considerations which impel us to outright prohibition, would preclude fragmentation of the religious services or the pursuit of this practice on a limited basis.

This cause is remanded to the Circuit Court at Newport and will be retained on the active docket for the enforcement of the injunction and such other, further and additional actions and orders as may become necessary.

Reversed.

The costs are assessed against the petitioners.

FONES, C. J., and COOPER, BROCK and HARBISON, JJ., concurring.