Mr. William Wetzel City Attorney City of Hialeah 501 Palm Avenue Hialeah, Florida 33010 Attention: Melissa Volker Assistant City Attorney
Dear Mr. Wetzel:
You have asked for an opinion on the following questions:
 1. DOES CH. 828, F.S., WHICH PROHIBITS THE UNNECESSARY KILLING OF ANIMALS, PROHIBIT A RELIGIOUS GROUP FROM SACRIFICING AN ANIMAL IN A RELIGIOUS RITUAL OR PRACTICE?
 2. DOES THE 1986 AMENDMENT TO CH. 828, F.S., WHICH PERMITS THE ENACTMENT OF ANY ORDINANCE IDENTICAL TO CH. 828, PREEMPT AND HENCE PROHIBIT A MUNICIPALITY FROM ENACTING AN ORDINANCE MAKING RELIGIOUS ANIMAL SACRIFICE UNLAWFUL, EVEN IF SUCH ORDINANCE DOES NOT CONFLICT WITH CH. 828?
On June 9, 1987, the City Council for the City of Hialeah unanimously adopted an ordinance identical to the provisions of Ch. 828, F.S. The ordinance apparently was adopted because a Santeria church recently opened in the city. Santeria is a religious group which uses the sacrificial killing of animals during many of its religious rituals.[1] A question has arisen whether such animal sacrifices, if not carried out for the primary purpose of food consumption, are prohibited by Ch. 828 and thus by city ordinance.
QUESTION ONE
Section 828.12, F.S., provides in pertinent part:
 Whoever . . . unnecessarily or cruelly . . . kills any animal, or causes the same to be done . . . is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or by a fine of not more than $5,000, or both.[2]
Section 828.12 is derived from a statute enacted in 1901.[3]
Other provisions of Ch. 828 relating to the humane treatment of animals are derived from laws originally enacted in the late 1800's or early 1900's.[4] These statutes express the longstanding concern of this state for the prevention of cruelty to animals. In your letter you refer to s. 828.22(3) and ask whether the Santeria practice of animal sacrifice, if done using a humane method as defined in s. 828.23, violates Ch. 828.
Sections 828.22-828.26, F.S., provide for the humane slaughtering of livestock.[5] These statutes, first enacted in 1961,[6]
are similar to the provisions of the Federal Humane Slaughter Act,7 U.S.C. § 1901 et seq.[7] An examination of the legislative history surrounding the enactment of the federal act indicates that the purpose of that act was to improve the humane handling and slaughter of animals for food.[8]
Section 828.22(1), F.S., sets forth the legislative findings for the adoption of ss. 828.22-828.26, stating:
 [T]he use of humane methods in the slaughter of livestock prevents needless suffering, results in safer and better working conditions for persons engaged in the slaughtering industry, brings about improvement of products and economy in slaughtering operations, and produces other benefits for producers, processors, and consumers which tend to expedite the orderly flow of livestock and their products.
Subsection (3) of s. 828.22, F.S., however, provides:
 Nothing in this act shall be construed to prohibit, abridge, or in any way hinder the religious freedom of any person or group. Notwithstanding any other provision of this act, in order to protect freedom of religion, ritual slaughter and the handling or other preparation of livestock for ritual slaughter are exempted from the terms of this act. For the purposes of this action [sic] the term "ritual slaughter" means slaughter in accordance with s. 828.23(7)(b).
"Humane method" is defined in s. 828.23(7)(b) to mean a method in accordance with ritual requirements of any faith whereby the animal suffers a loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument.
Sections 828.22-828.26 do not define the term "slaughter." However, an examination of the act as a whole indicates that the purpose of ss. 828.22-8282.26 is to ensure that the killing of animals for use as food is conducted in a humane manner.[9]
For example, s. 828.23, F.S., defines certain terms for purposes of ss. 828.22-828.26:
* * *
 (3) "Slaughterer" means any person regularly engaged in commercial slaughtering of livestock.
 (4) "Livestock" means cattle, calves, sheep, swine, horses, mules, goats, and any other animal which can be or may be used in and for the preparation of meat or meat products.
 (5) "Packer" means any person engaged in the business of slaughtering, or of manufacturing or preparing meat or meat products for sale. . . .
Section 828.24(3), F.S., provides that this act shall not apply to any person, firm or corporation slaughtering or processing for sale within the state not more than 20 head of cattle nor more than 35 head of hogs per week.
In interpreting statutes, the legislative intent must be ascertained from an examination of the statute as a whole.[10]
Based upon my examination of ss. 828.22-828.26, I am of the opinion that the purpose of the act is to regulate the killing of animals for food. Subsection (3) of s. 828.22 therefore must be read in that context.
Since I am of the opinion that the term "slaughter" as used in the act refers to the killing of animals for food, the exemption in s.828.22(3) for "ritual slaughter" would appear to refer to the religious slaughtering of animals for food. Thus s. 828.22(3) does not, in my opinion, relate to or exempt from other substantive prohibitions in Ch. 828 the ritual sacrifice of animals for purposes other than food consumption.
Furthermore, I cannot conclude that the ritual killing of an animal constitutes a "necessary" killing so as to make the prohibition in s. 828.12 against unnecessarily or cruelly killing an animal inapplicable. The Florida Supreme Court, in concluding that the term "unnecessarily" as used in s. 828.12 is not unconstitutionally vague, has stated:
 The particular words complained of, "unnecessarily . . ." are not vague when considered in context of the entire Statute and with a view to effectuating the purpose of the act. . . .[11]
I am not aware of any Florida appellate decision which has considered the applicability of s. 828.12 to the ritual sacrifice of animals. However, when considered in context of Ch. 828 and with a view to effectuating the purpose of that chapter, I am of the opinion that the sacrificial killing of animals other than for food consumption is prohibited by s. 828.12.
Since your letter relates to the practices of a religious group, a question may be raised regarding whether the state's power to prohibit or otherwise restrict such practices would be upheld against an assertion that those practices are protected under either the state or federal Constitution.[12]
Initially, a determination of whether any particular religious group is entitled to the protections afforded by the state and federal Constitutions regarding freedom of religion can only be made by a court of competent jurisdiction. Furthermore, this office must presume the constitutionality of any duly enacted statute. With those caveats, however, I would offer the following general comments for your consideration.
While freedom of religion is constitutionally guaranteed, the courts have recognized a distinction between religious belief and religious practice. While laws may not restrict religious beliefs, religious practices may be subject to governmental regulation under certain circumstances.[13]
In Sherbert v. Verner,[14] the United States Supreme Court developed a two tiered approach in determining whether a state may restrict a religious practice: first, does the statute infringe upon the free exercise of religion; and second, does a compelling state interest exist which justifies such infringement.
The courts have recognized that the state may restrict religious practices which pose a serious threat to the health, safety and welfare of its citizens. In such cases, the courts, both state and federal, have recognized the need to limit certain religious practices.
For example, in Reynolds v. United States,[15] the United States Supreme Court upheld a prohibition against polygamy even though members of the Church of Jesus Christ of Latter-Day Saints claimed that polygamy was a practice required by their religion. Recognizing the government's authority to regulate or restrict certain religious practices, the Court stated:
 Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?
* * *
 Can a man excuse his practice to the contrary [of law] because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.[16]
In State ex rel. Swann v. Pack,[17] the Tennessee Supreme Court permanently enjoined defendants from handling poisonous snakes or from consuming poisonous substances even though such activities were a part of a religious service, stating that "[t]he problem becomes one of balancing the interests between religious freedom and the preservation of the health, safety and morals of society." The Court established certain guidelines for applying the balancing test:
 Free exercise of religion does not include the right to violate statutory law.
 It does not include the right to commit or maintain a nuisance.
 The fact that one acts from the promptings of religious beliefs does not immunize against lawless conduct.[18]
More recently, the Florida Supreme Court, in Town v. State ex rel. Reno,[19] applied the balancing test in determining whether the state had a compelling interest in restricting the use of cannabis as religious practice. Finding that cannabis is a dangerous drug, that it was indiscriminately used not only by members of the church but by others including children, the Court held that the state had sustained its burden of demonstrating a compelling interest in restricting this practice.
Section 828.12, F.S., expresses the concern of the people of the State of Florida for the humane treatment of animals. Similar statutes prohibiting cruelty to animals have been upheld as a valid exercise of the police power. It has been said that the purpose of such statutes is not only the protection of animals but also the conservation of public morals which wanton cruelty to living creatures is considered to corrupt.[20]
Thus, in determining whether a duly enacted statute may be applied by a state to prohibit a particular religious practice, the courts must weigh the interests of religious freedom and of the state in the preservation of the health, safety and morals of society. Upon finding that a compelling state interest exists, the court could approve the application of the prohibition against a particular religious practice, such as the sacrificial killing of animals. As one judge stated, "[i]t would seem clear, beyond debate, that if a group claimed a first amendment right to reestablish the ancient Temple requirements of twice-daily animal sacrifices, the State, under proper conditions, could prohibit such acts. The right of one's religious freedom does not totally eliminate the State's right to regulate the health, safety, and welfare of its citizens in an appropriate case."[21]
QUESTION TWO
Section 828.27, F.S. (1986 Supp.), authorizes the governing body of a municipality to enact ordinances relating to animal control or cruelty. The statute sets forth certain mandatory provisions of any such ordinance adopted by the local government.[22]
Subsection (4) of s. 828.27, however, provides:
 Nothing contained in this section shall prevent any county or municipality from enacting any ordinance relating to animal control or cruelty which is identical to the provisions of this chapter or any other state law, except as to penalty. However, no county or municipal ordinance relating to animal control or cruelty shall conflict with the provisions of this chapter or any other state law.
It is clear that municipal ordinances are inferior to state statutes and to the extent of any conflict, must fail.[23] A municipal ordinance cannot authorize what a state statute prohibits, nor can it prohibit what a state statute authorizes. To do so would constitute a conflict with the superior state law.
Therefore to the extent that s. 828.27, F.S. (1986 Supp.), authorizes the enactment of a municipal ordinance identical to the state statutes except as to penalty, a municipality may adopt an ordinance which prohibits an action or activity which the state statute prohibits.
SUMMARY
 1. Unless and until the Legislature modifies the statutes, it is my opinion that Florida law, specifically s. 828.12, F.S., prohibits the sacrificial killing of animals other than for the primary purpose of food consumption.
 2. Based on my response to Question One, it is my opinion that a municipality may adopt an ordinance prohibiting the religious sacrifice of animals within the city pursuant to s. 828.27, F.S. (1986 Supp.).
Sincerely,
Robert A. Butterworth Attorney General
RAB/tjw
[1] Martinez, R. and Wetli, C., Santeria: A Magico-Religious System of Afro-Cuban Origin, The American Journal of Social Psychiatry, pp. 33-37, Vol. II, No. 3, Summer 1982.
[2] See, s. 828.02, F.S. (1986 Supp.), defining "animal" to include "every living dumb creature." And see, Wilkerson v. State,401 So.2d 1110 (Fla. 1981), holding that the definition of "animal" in s. 828.02 and "unnecessarily" in s. 828.12 are not unconstitutionally vague.
[3] Section 4, Ch. 4971, 1901 Laws of Florida.
[4] See, e.g., Ch. 3921, 1889 Laws of Florida, entitled "AN ACT For the Prevention of Cruelty to Animals."
[5] See, s. 828.22(2), F.S., providing that it is the policy of this state to require that the slaughter of all livestock and the handling of livestock in connection with slaughter be carried out by humane methods.
[6] See, Ch. 61-254, Laws of Florida.
[7] Pub.L. 85-765, August 27, 1958, 72 Stat. 862.
[8] See, Senate Report No. 1724 regarding the hearings held on H.R. 8308 (with amendments, enacted as Pub.L. 85-765):
 At the hearings, in general, all witnesses have favored the adoption of improvements in the humane handling and slaughtering of food animals. Differences of opinion have been expressed only in the area of how the objective was to be accomplished. 1958 U.S. Code Cong. and Adm.News, p. 3933.
[9] See, the legislative findings and statement of policy in s.828.22(1) and (2), F.S.
[10] See, Shuman v. State, 358 So.2d 1333 (Fla. 1978); Mixon v. Keller, 372 F. Supp. 51 (M.D.Fla. 1974), affirmed in part and remanded, 516 F.2d 898 (5th Cir. 1975) (meaning of word or phrases used in a statute must be construed by examining entire piece of legislation as well as its legislative history).
[11] Wilkerson v. State, 401 So.2d 1110, 1112 (Fla. 1981), quoting, Campbell v. State, 240 So.2d 298, 299 (Fla. 1970), appeal dismissed, 402 U.S. 936 (1971). Cf., Grise v. State, 37 Ark. 456
(Ark.1881), as discussed in 82 A.L.R.2d 794, 810, stating that "needless" killing refers to an act done without any useful motive, in a spirit of wanton cruelty or for the mere pleasure of destruction without being in any sense beneficial or useful to the person killing the animal.
[12] See, 1st Amend., U.S. Const. ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."); s. 3, Art. I, State Const. ("There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety").
[13] Town v. State ex rel. Reno, 377 So.2d 648 (Fla. 1979), cert. den., 449 U.S. 803 (1980), pet. for reh. den., 449 U.S. 1004
(1980).
[14] 374 U.S. 398 (1963).
[15] 98 U.S. 145 (1878).
[16] Id. at 166-167. And see, Davis v. Beason, 133 U.S. 333, 342
(1890) ("It was never intended or supposed that the [1st] amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society").
[17] 527 S.W.2d 99, 111 (Tenn. 1975), cert. denied,424 U.S. 954 (1976).
[18] 527 S.W.2d at 111.
[19] 377 So.2d 648 (Fla. 1979), cert. den., 449 U.S. 803 (1980), pet. for reh. den., 449 U.S. 1004 (1980).
[20] 4 Am.Jur.2d Animals s. 27. See, e.g., Commonwealth v. Higgins, 178 N.E. 536 (Mass. 1931) (cruelty to animals statute was intended to be in the interest of the public morals; it is directed against acts which may be thought to have a tendency to dull humanitarian feelings and to corrupt the morals of those who observe or have knowledge of these acts). And see, 3A C.J.S. Animals s. 99 ("validity of statutes prohibiting cruelty to animals has been sustained as a valid exercise of the police power, their aim being not only to protect these animals, but also to conserve public morals, both of which are proper subjects of legislation").
[21] State v. Faith Baptist Church, 301 N.W.2d 571, 580 (Neb. 1981) (Krivosha, C.J., concurring in part and in part dissenting).
[22] See, s. 828.27(2)(a)-(f), F.S.
[23] City of Miami Beach v. Rocio Corp., 404 So.2d 1066 (3 D.C.A.Fla., 1981), pet. for review den., 408 So.2d 1092
(Fla. 1981).