Jacob GINGERICH; Emanuel Yoder; and Levi Zook, Appellants,

v.

COMMONWEALTH of Kentucky, Appellee.

and

Menno Zook; David Zook; Eli Zook; Mose Yoder; Levi Hostetler; Jacob Gingerich; and Danny Byler, Appellants,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2011–SC–000379–DGE, 2011–SC–000380–DGE.

Supreme Court of Kentucky.

Oct. 25, 2012.

William Ellis Sharp, ACLU of Kentucky, Patricia Colleen Le Meur, Phillips, Parker, Orberson & Arnett, PLC, Louisville, KY, for appellants.

Jack Conway, Attorney General, Christian Kenneth Ray Miller, Assistant Attorney General, Office of Criminal Appeals, Frankfort, KY, for appellee.

Michael L. Goodwin, Louisville, KY, for Amicus Curiae, National Committee for Amish Religious Freedom; And the Mennonite Central Committee.

Opinion of the Court by Justice NOBLE.

The Appellants in these two cases, Zook et al. and Gingerich et al.,[1] have argued to this Court that KRS 189.820 unconstitutionally interferes with their freedom to practice their religion as required by their beliefs. The Commonwealth argues that the statute regulates safety on the public highways by requiring slow-moving vehicles to display a particular brightly colored emblem to warn of the vehicles' slow speed. The Appellants, all members of the Old Order Swartzentruber Amish, claim that the bright orange-yellow of the requisite emblem and its triangular shape are at odds with their religious beliefs, and that forcing them to use the emblem interferes with their requirement to be plain and brightly displays the trinity, a symbol not adopted by the Amish.

Because we find that KRS 189.820 is a statute designed to protect the public and is not specifically targeted at preventing any religious practice, it is a statute of general applicability. The government need only establish a rational basis for the statute in order to pass constitutional muster.

Here, the lower courts found that common sense established that the bright color, reflective edge, and distinct shape of the slow-moving vehicle emblem required by the statute increased the visibility of the intended warning, both night *and* day, and was superior to the gray reflective tape proposed instead by Appellants, which only provides a protective warning at night. The lower courts, having established the requisite rational basis for the statute, were affirmed by the Court of Appeals, which is in turn affirmed.

## I. Background

Before 2012,[2] Kentucky required that slow-moving vehicles whether "sold, leased, or rented" or "for use" on the public highways of Kentucky have a slow-moving vehicle emblem as standard equipment that was to be displayed both day and night when in operation. KRS 189.820. A slow-moving vehicle emblem (SMV emblem) "[c]onsists of a fluorescent yellow-orange triangle with a dark red reflective border as specified in American Society of Agriculture Engineers R276 or Society of Automotive Engineers J943 standards, or consisting of reasonably similar reflective qualities as specified in said standards." KRS 189.810(2). Failure to display the emblem on a slow-moving vehicle was a misdemeanor, punishable only by a fine for $20 to $35. KRS 189.993(5).

Appellants, members of the Old Order Swartzentruber sect of the Amish religion, operated horse-and-buggy vehicles on Kentucky roadways during daylight hours without displaying the SMV emblem. They were stopped and ticketed for being in violation of the statute, and thereby ostensibly creating a road hazard. Nine different persons were stopped and ticketed, one on four different occasions.

Three of the defendants below—Jacob Gingerich, Emanuel Yoder, and Levi Zook—proceeded with a joint bench trial in Graves District Court. The remaining six, Menno Zook, David Zook, Eli Zook, Mose Yoder, Levi Hostetler, Jacob Gingerich and Danny Byler were tried jointly by a jury in Graves District Court.

The bench-trial defendants claimed that KRS 189.820 violated their constitutional rights to the free exercise of their religion under Sections 1 and 5 of the Kentucky

---

1. Though these are technically separate cases, they have identical legal issues and thus are being resolved in a single opinion.

2. These statutes were amended in 2012 to change the requirements for slow-moving vehicles. *See* 2012 Ky. Acts ch. 53, §§ 1–3.

Constitution.[3] They were found guilty of violating the statute and fined the minimum amount, $20.00, by the trial court, which took into account that the defendants were conflicted between the law and their religious beliefs. The trial court also imposed court costs of $128, resulting in a total fine and costs of $148.00 each.

The trial court analyzed the conflict between the defendants' stated religious beliefs and compliance with the statute's requirement of displaying a SMV emblem based on there being a "compelling state interest" in promoting highway safety, which it held overcame the defendants' free exercise of religion claims. The trial court found that since the violations occurred in the daytime, the bright color required by the statute for the SMV emblem served as an adequate warning to other drivers, and that since the gray reflective tape did not adequately fluoresce in daylight, the SMV emblem was the least restrictive alternative to provide for public safety. At least in terminology, the trial court applied the "strict scrutiny" standard of review to the statute.

The jury-trial defendants also argued that the statute violated their constitutional right under Sections 1 and 5 of the Kentucky Constitution in a pretrial motion to dismiss, which was denied. The case then went to trial before a jury. The defendants claimed in their defense that complying with the statute violated their religious beliefs, that they would be shunned by their religious community if they obeyed the statute, and that the silver reflective tape they were willing to use was the equivalent of the SMV emblem, a defense they claimed was supported by the language in the statute referencing materials of "reasonably similar reflecting qualities." They offered no testimony about how this would compare in daylight. The jury rejected these defenses, and found the defendants guilty on all counts, and recommended a $25.00 fine. The trial court imposed the fine and costs.

Both the bench-trial defendants and the jury-trial defendants appealed to Graves Circuit Court.

As to the bench-trial defendants, the circuit court rejected "strict scrutiny" as the proper standard of review for the constitutionality of the statute, holding that the Kentucky Constitution was not more protective of the free exercise of religion than the United States Constitution was and thus offered no greater protection for the free exercise of religion than the federal courts allowed. The circuit court further noted that KRS 189.820 was not specifically enacted to prohibit the Old Order Swartzentruber Amish from practicing their religion, but rather was enacted as a law generally applicable to all slow-moving vehicles to promote public safety on the highways. The Graves District Court was affirmed, because its decision was appropriate under the "rational basis" standard of review.

As to the jury-trial defendants, the Graves Circuit Court recognized that the issues were the same as those in the appeal from the bench trial, and incorporated by reference its opinion in that case, affirming the Graves District Court jury verdict.

All the defendants filed motions for discretionary review with the Kentucky Court of Appeals, which were granted. That court rendered a unanimous opinion on June 3, 2011, resolving all the cases and affirming the Graves Circuit Court. The Court of Appeals agreed that the Kentucky Constitution does not offer more protection for religious freedom than the

---

**3.** None of the defendants raised a claim based on the federal constitution.

United States Constitution does, and found that the rational basis standard of review applied by the federal courts is the appropriate standard of review for Kentucky cases on laws of general applicability. Under that analysis, the Court of Appeals held that KRS 189.820 is a neutral law of general applicability enacted for the public welfare and does not impermissibly restrict religious practice. But that court did go further and analyzed the case under strict scrutiny and found that the statute passed that standard of review as well, which was more analysis than the cases called for, and could inevitably lead to confusion.

This Court granted discretionary review in order to clearly establish the standard of review for laws of general applicability, enacted for the common good, which only incidentally affect the practice of one's religion.

## II. Analysis

These cases present an opportunity for this Court to clarify what the Kentucky Constitution requires when a claim is made that a statute violates religious freedom by interfering with the practice of a religion. While we have recognized that the Kentucky Constitution *may* afford greater protection of individual rights than those prescribed by the United States Supreme Court,[4] this Court has often stated regarding particular sections of the Kentucky Constitution that our state constitution offers no more protection than the same or similar section of the federal constitution. *See, e.g., LaFollette v. Commonwealth,* 915 S.W.2d 747, 748 (Ky.1996) ("Section 10 of the Kentucky Constitution provides no greater protection than does the federal Fourth Amendment."); *McCall v. Courier–Journal and Louisville Times Co.,* 623 S.W.2d 882, 894–95 (Ky.1981) ("Each of our four constitutions have qualified freedom of speech and press by responsibility for abuse of these liberties. Clearly these provisions were not intended to grant greater protection than the First Amendment to the federal constitution which antedated our first constitution adopted in 1792 by four months."). We now state that this principle is also true of the free-exercise-of-religion protections in Section 1 and Section 5 of the Kentucky Constitution.[5]

4. In *Commonwealth v. Wasson,* 842 S.W.2d 487 (Ky.1992), this Court held that it is "not bound by decision of the United States Supreme Court when deciding whether a state statute impermissibly infringes upon individual rights guaranteed in the State Constitution so long as state constitutional protection does not fall below the federal *floor,* meaning the minimum guarantee of individual rights under the United States Constitution as interpreted by the United States Supreme Court." *Id.* at 492 (citing *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975)). In fact, *Wasson* read the Kentucky Constitution as providing greater equal protection rights than the federal courts had, at that time, read in the United States Constitution. *Id.* at 492–93. Other decisions have read portions of the Kentucky Constitution more broadly than the federal constitution has been read. *See, e.g., Baucom v. Common-*

*wealth,* 134 S.W.3d 591, 592 (Ky.2004) (recognizing that Section 11 of the Kentucky Constitution affords *greater* protection than the federal constitution because it guarantees "hybrid representation" for an accused).

5. Section 1 states, in relevant part: "All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned ... [t]he right of worshipping Almighty God according to the dictates of their consciences."

Section 5 states:
No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of

It has been argued in these cases that the last sentence of Section 5 of the Kentucky Constitution, "No human authority shall, in any case whatever, control or interfere with the rights of conscience," grants *more* protection to religious practice than the First Amendment of the United States Constitution. Certainly, the language in the Kentucky Constitution is more specific. But it is linguistically impossible for language to be more inclusive than that in the First Amendment: "Congress shall make *no law* respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I (emphasis added). "Free exercise" of religion arguably requires a government to not place restrictions on the religious practice.

But governments are required to do many other things as well, some of which may conflict with a particular religious practice. In fact, Section 5 of the Kentucky Constitution, in its entirety, sets forth some of these things. Our state government may not give preference to any religious sect, society, denomination, creed, mode of worship or system of ecclesiastical polity. Our state government cannot compel religious attendance nor the participation in building or maintaining churches or paying ministers. Parents may not be compelled to send their children to schools which they conscientiously oppose. And no one can have his or her civil rights, privileges, or capacities taken away or enlarged because of religious belief.

But at times, varied religious beliefs come into conflict with one another. And the government is also charged with acting for the common good. As this Court's predecessor previously stated in *Lawson v. Commonwealth,* 291 Ky. 437, 164 S.W.2d 972, 976 (1942):

> Laws enacted for the purpose of restraining and punishing acts which have a tendency to disturb the public peace or to corrupt the public morals are not repugnant to the constitutional guaranties of religious liberty and freedom of conscience, although such acts may have been done pursuant to, and in conformity with, what was believed at the time to be religious duty. Without violating the constitutional guaranties, the state, under the police power, may enact laws in order to promote the general welfare, public health, public safety and order, public morals, and to prevent fraud.

In other words, the government is likely to be confronted with situations where the common good comes into conflict with the free exercise of a particular religion. But how does the government function when there are conflicting constitutional mandates?

■ Relying on precedent of the United States Supreme Court, this Court's predecessor held that religious freedom has two components: freedom to believe and freedom to act. *Mosier v. Barren County Board of Health,* 308 Ky. 829, 833, 215 S.W.2d 967, 969 (1948) (citing *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), and *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)); *Lawson,* 164 S.W.2d at 973 (citing the same cases). What one chooses to believe is an *absolute* freedom, which no power on earth can in reality arbitrate. *Mosier,* 215 S.W.2d at 969.

religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience.

But, "in the nature of things," freedom to act cannot be absolute in human society where beliefs and practices vary, and where a given practice, absolutely freely enacted, can inflict harm on others. *Id.* Thus religious *conduct* must remain subject to regulation for the protection of society. *Id.* Or stated another way, "the constitutional guarantee of religious freedom does not permit the practice of religious rites dangerous or detrimental to the lives, safety or health of the participants or to the public." *Id.* (citing *Lawson,* 164 S.W.2d at 976).

■ As both our state and federal law have long held, then, government can act to restrict the free exercise of religion when that exercise is detrimental to the common good. But given the certain terms of the Kentucky and federal constitutions regarding interference with religious practice, there must be a burden the government meets before it can do so. Whether the governmental regulation is subject to a heightened level of review or whether it must merely meet a rational governmental purpose is determined by the action the government takes, why it is taking it, and how much the act restricts religious practice.

The federal courts have made a clear distinction. Those courts have determined that governmental acts done for the health, safety and welfare of the public, which are applied generally to everyone, need only have a rational basis even when they incidentally affect religious practice. *See Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

In *Smith,* the respondents were fired from their jobs at a private drug rehabilitation facility for ingesting peyote, a hallucinogenic drug prohibited by Oregon statute, as part of a religious ritual of the Native American Church, of which both were members. When they applied for unemployment compensation, their applications were denied on the grounds that they were fired for violating the law. They challenged the law on the grounds that it violated the Free Exercise Clause of the First Amendment of the United States Constitution. The United States Supreme Court held that "the First Amendment has not been offended" because "prohibiting the exercise of religion ... is not the object of the [statute] but merely the incidental effect of a generally applicable and otherwise valid provision." *Id.* at 878, 110 S.Ct. 1595. Moreover, the Court held that government actions that substantially burden a religious practice need not be justified by a "compelling governmental interest," so long as they are generally applicable. *Id.* at 884, 110 S.Ct. 1595.[6]

■ Subsequent United States Supreme Court cases that have cited *Smith* approvingly have stated that it stands for the

---

6. Congress enacted the Religious Freedom Restoration Act (RFRA) in 1993 as a response to the Court's holding in *Smith.* The RFRA, enacted pursuant to Congress' power under Section 5 of the Fourteenth Amendment, responded to *Smith* by expressly requiring the government to demonstrate that a statute burdening a religion is "(1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(c) (1993). In *City of*

*Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court declared RFRA unconstitutional as applied to the states. However, the RFRA, as subsequently amended, has been upheld as valid as applied to the federal government. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). Therefore, the Court's holding in *Smith* remains good law with respect to the states.

proposition that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Though the Supreme Court has not expressly said so, the test for such statutes is the rational-basis test, *e.g., Combs v. Homer–Center School Dist.,* 540 F.3d 231, 242–43 (3d Cir.2008), under which the statute is presumed to be constitutional and which provides that " '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller v. Doe by Doe,* 509 U.S. 312, 320–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)).

■ But on the other hand, the U.S. Supreme Court has held that governmental acts that are directed specifically at restricting a given religious practice, and are thus not generally applicable, are subject to strict scrutiny. *Church of Lukumi,* 508 U.S. at 531, 113 S.Ct. 2217. *When* a statute must pass the strict scrutiny standard of review, the government must establish a "compelling state interest" requiring the enactment, and that the method it applies in the statute is "nar-rowly tailored to advance that interest" (often referred to as the least restrictive alternative) before the statute can restrict the religious practice. *Id.* at 531–32, 113 S.Ct. 2217.

In *Church of the Lukumi,* the United States Supreme Court held that a city ordinance prohibiting animal sacrifice was an unconstitutional violation of the Free Exercise Clause because the ordinance was targeted at practitioners of the Santeria religion, and was therefore neither generally applicable nor neutral. The Court made clear that "[f]acial neutrality is not determinative" and that "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.* at 535, 113 S.Ct. 2217. Thus, the city council had the burden of proving that it had a "compelling government interest" and that the ordinance was "narrowly tailored to achieving that interest," burdens that the city council did not meet.

The distinction between the different levels of review has not been as clear in the decisions of this Court and its predecessor. The Kentucky courts have often found it difficult not to blend these levels of review, as *Lawson* and *Mosier* illustrate. Both cases are commonly viewed as using a strict scrutiny standard, but the cases blend some of the analysis.[7] Thus,

---

7. It is important to note that this Court is not suggesting that *Lawson* and *Mosier* were incorrect applications of federal precedent. Placing the cases in their historical contexts demonstrates that the highest court in Kentucky would have had no reason to pay mind to whether the cases required strict scrutiny or rational basis review because those notions were not clearly established or quantified in the 1940s. The notion of a heightened standard of review was not introduced until 1938 in the infamous Footnote 4 of *United States v. Carolene Products,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), a mere four years before *Lawson.* Importantly, Footnote 4 did not elucidate what the heightened standard was; it merely introduced the notion that statutes burdening certain fundamental rights require more scrutiny than other statutes. It was not until 1944, two years *after Lawson* and only four years before *Mosier,* that the Supreme Court first acknowledged

the question of the proper standard of review under the Kentucky Constitution remains open.

In *Lawson,* this Court reviewed a statute that specifically prohibited the use of snakes in a religious service. 164 S.W.2d at 972. Thus, the actual practice of religion was targeted by the statute. As noted above, when a statute is aimed at a particular religious practice, federal law requires that strict scrutiny be applied to the purpose of the statute, and the government is required to have a compelling interest to support the enactment, and the statute must be narrowly tailored to achieve the interest. *See Church of the Lukumi,* 508 U.S. at 546, 113 S.Ct. 2217. In *Lawson,* the Court focused primarily on public safety through prohibiting exposing citizens to venomous snake bites, clearly a compelling governmental interest, and because of the potential for death, there really was no other alternative to the governmental regulation. *Id.* at 976. Though *Lawson* does not use the words, this meant the law was narrowly tailored. Thus *Lawson* is perceived as a strict scrutiny case, and since the statute actually prohibited a particular religious practice, that is the appropriate standard of review.

On the other hand, though also viewed as a case applying strict scrutiny, *Mosier* did not require it. The Board of Health had issued a regulation requiring all children to be vaccinated for smallpox, and any child who was not vaccinated was to be excluded from the city schools. 215

S.W.2d at 968. The evidence supported the public health concerns behind the regulations, and the regulations applied to all children. *Id.* Two fathers, Mosier and a man named Stuart stated several reasons why their children should not be vaccinated. Stuart specifically claimed that "his religious and conscientious belief prevented him from subjecting his children to vaccination by injecting foreign substances into the veins," and that requiring him to have the children vaccinated thus violated Section 1 of the Kentucky Constitution. *Id.* at 969.

The Court cited *Lawson* as authority, but the facts establish a distinct difference. The regulation was not directed at a specific religious practice, but rather applied generally to all children, and any impact on religious practice was purely incidental. The regulation stood because there was a rational basis for enactment, which the Court specifically found: to stop the spread of a dangerous disease. Glasgow was located on a central travel artery with many soldiers coming home from Europe (World War II), and the traffic could spread the very contagious disease; vaccination was a sure preventive of the disease; and it was too late to vaccinate when an epidemic occurred. *Id.* at 968. The Court did not discuss whether this was the least restrictive alternative, and did not need to because the regulation had general applicability and was not aimed at a specific religious practice. Rather, the Court simply concluded that while religious beliefs could not be regulated, conduct could,

the specific standard of "strict scrutiny" in *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). In that case, Justice Black wrote, "It should be noted, to begin with, that all legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny. Pressing public ne-

cessity may sometimes justify the existence of such restrictions; racial antagonism never can." *Id.* at 216, 65 S.Ct. 193. This historical context demonstrates that today's opinion is neither a criticism nor a departure from prior jurisprudence; rather, it is a long-needed clarification of the question of which standard of review should apply to these situations.

and thus Stuart could "not endanger the health of the community by refusing to have his daughter vaccinated." *Id.* at 969.

This Court now finds that statutes, regulations, or other governmental enactments which provide for the public health, safety and welfare, *and* which are statutes of general applicability that only incidentally affect the practice of religion, are properly reviewed for a rational basis under the Kentucky Constitution, as they are under the federal constitution. Enactments that directly prohibit or restrain a religious practice are subject to a strict scrutiny standard of review. As discussed above, providing this clearer standard brings Kentucky's jurisprudence in line with United States Supreme Court precedent.

Given the facts of this case, then which standard of review applies? Are KRS 189.820(1) and (2) constitutional?

KRS 189.820 is on its face most directly aimed at farm vehicles, rather than the Amish conveyance buggies, but clearly applies to *all* slow-moving vehicles on the public highways. The emblem standards specified refer to agriculture and *motor* vehicles. The statute is clearly a statute of general applicability, aimed at protecting public safety on the highways by requiring a brightly colored, reflective, universally shaped warning emblem. It does not prohibit any religious practice, and only incidentally impacts the Amish way of life because the Amish believe that they should generally travel in horse-drawn buggies. In fact, the record indicates some exceptions are made for vehicles driven by non-Amish persons. We need not debate whether this is a lifestyle choice or an actual religious choice. In either event, the statute is not aimed at slow-moving vehicles because they are a choice (or a religious practice), but rather because they are dangerous, in comparison to posted legal speeds on the highway. And, if a slow-moving vehicle is dark in color or is in deep shade, it is difficult to see whether it is an Amish buggy or a dusty combine.

The slow-moving buggies of the Appellants that did not display the SMV emblem, *or any other warning mechanism,* presented the potential harm the statute was enacted to counter, and the vehicles are regulated on the public highways because they are slow, not because they are a religious choice. Since the Kentucky Constitution provides no greater protection to religious practice than the federal Constitution does, this Court will follow federal precedent, and thus the statute is presumed constitutional unless there is *no* rational basis for it. But there is ample rational basis for such a statute: it is aimed at public general safety, and works toward that goal in several ways (e.g., by using a universal symbol, increasing visibility over vehicles without the emblem). Thus, this Court finds that KRS 189.820 meets the rational basis standard of review and is thus not unconstitutional. Appellant's convictions and penalties must stand.

### III. Conclusion

The opinion of the Court of Appeals is affirmed.

All sitting. MINTON, C.J.; CUNNINGHAM and SCHRODER, JJ., concur. VENTERS, J., concurs in result only by separate opinion. SCOTT, J., dissents by separate opinion in which ABRAMSON, J., joins.

VENTERS, J., concurs in result only by separate opinion:

I concur with the Majority's conclusion: the enforcement of KRS 189.820 against

Appellants does not violate their religious liberty under either the Kentucky Constitution or the United States Constitution. However, I write separately to register my disagreement with the proposition that the protection of liberty provided by the Kentucky Constitution simply mirrors the comparable protections afforded by the federal Constitution.

The words used in each document are somewhat different and each document should be interpreted in light of the words used within it. To the extent that the different words used may describe the same concept, some of the protections afforded by one document may overlap with the other. However, to the extent that different words denote different meanings, each Constitution must be respected in its own right.

This Court is the final arbiter of the meaning of the Kentucky Constitution, and our interpretation of its terms should not be constrained by the opinions of federal courts interpreting the United States Constitution. Those opinions may be instructive and influential in our review of our state Constitution, but they do not control the meaning of the Kentucky Constitution; nor do they define the protections of liberty contained therein. We should no longer tether the meaning of the Kentucky Constitution to the pendulum of the federal court interpretations of the federal Constitution.

SCOTT, J., dissenting:

I respectfully dissent. In my opinion, the Kentucky Constitution unquestionably affords greater protection to the free exercise of religion than does the Federal Constitution. Accordingly, any law interfering with an individual's free exercise of religion must pass strict scrutiny or else be declared unconstitutional. Given that KRS 189.820 cannot pass strict scrutiny,

Appellants' convictions cannot stand. Thus, I would reverse the Court of Appeals' judgment.

## I. KENTUCKY'S CONSTITUTION

I begin by rejecting the majority's conclusion that Kentucky's Constitution does not afford greater protection to the free exercise of religion than its federal counterpart. First, the majority contends that "it is linguistically impossible for language to be more inclusive than that in the First Amendment: 'Congress shall make *no law* respecting an establishment of religion, or prohibiting the free exercise thereof ....'" *Ante,* op. at 840 (*quoting* U.S. Const. amend. I). Not only is it linguistically *possible* to be more inclusive than the First Amendment, Section 5 of Kentucky's Constitution is linguistically *more inclusive.* Presumably, the framers of Kentucky's Constitution used more inclusive language with the intent it would offer *greater* protection than the Federal Constitution.

When Kentucky's current Constitution was adopted in 1891, the Federal Constitution had been in effect for nearly a century. If, as the majority suggests, the framers of Kentucky's Constitution intended its provisions to be co-extensive with the Federal Constitution, it *could have* (and, one would expect, *would have* ) used the same language. *See Ky. State Bd. for Elementary and Secondary Ed. v. Rudasill,* 589 S.W.2d 877, 880 and n. 2 (Ky.1979). Instead, the framers went beyond the mandates of the Federal Constitution and proscribed *more* activity than does the First Amendment.

For example, the First Amendment provides, in relevant part, that: (1) *Congress,* shall make (2) no *law* (3) *prohibiting* the free exercise of religion. *See* U.S. Const. amend. I. In contrast, Kentucky's Constitution provides, in relevant part, that: (1)

*no human authority* shall (2) *in any case whatever* (3) *control or interfere with* the rights of conscience. *See* Ky. Const. § 5. Obviously, "no human authority" is broader than "Congress"; "any case whatever" is broader than "law"; and "control or interfere with" proscribes more activity than an outright "prohibiti[on]." Thus, it is clear to me that the framers of Kentucky's Constitution *intended* to afford greater protection under Section 5 than does the First Amendment.

> This conclusion is reinforced by the rest of Section 5: No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching.

This goes far beyond proscribing a legislative body from making a law prohibiting the free exercise of religion. It makes clear the framers' intent that religious liberty should be zealously protected.

Additionally, Section 26 of Kentucky's Constitution protects Sections 1 through 25:

> To guard against transgression of the high powers which we have delegated, We Declare that everything in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution, shall be void.

Because KRS 189.820, as applied to the Swartzentruber Amish, is contrary to Sections 1[8] and 5 of the Bill of Rights, I would hold that it is void *unless* it passes strict scrutiny—any weaker standard does little to "guard against transgressions of the high powers which [the framers] have delegated." Ky. Const. § 26. Stated differently, "[a] court cannot deprive a person of a 'core value' constitutional right with a 'rational basis' test." *Posey v. Commonwealth,* 185 S.W.3d 170, 204 (Ky.2006) (Scott, J., concurring in part and dissenting in part) (*citing Republican Party of Minn. v. White,* 536 U.S. 765, 774, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002)).

Finally, other jurisdictions have analyzed identical issues as the one before us under strict scrutiny and held the SMV emblem requirement violated a state constitutional provision. *See, e.g., Wisconsin v. Miller,* 202 Wis.2d 56, 549 N.W.2d 235, 239–40 (1996). In *Miller,* the Supreme Court of Wisconsin recognized that the U.S. Supreme Court held in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) that a rational basis standard of review would be employed for federal constitutional challenges to laws of general applicability. *Id.* at 240. However, it concluded "that the guarantees of [Wisconsin's] state constitution will best be furthered through continued use of the compelling interest/least restrictive al-

---

**8.** Section 1 states, in relevant part: "All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned ... [t]he right of worshipping Almighty God *according to the dictates of their consciences.*" (Emphasis added.) Obviously, requiring the Swartzentruber Amish to comply with a law that *violates* the dictates of their consciences would be unconstitutional.

ternative analysis of free conscience claims and see no need to depart from this time-tested standard." *Id.* at 241. I agree with the Supreme Court of Wisconsin.

Employing a rational basis standard renders inconsequential Kentucky's free exercise guarantee in that virtually any asserted governmental interest could justify laws of general applicability that have the effect of substantially burdening individuals' religious liberty. Such a deferential view of government action cannot adequately protect members of non-mainstream faiths from governmental encroachment upon their religious liberty and should be rejected because "construction [of a constitutional provision that is] so loose as to virtually nullify the section, which is mandatory in its terms, should not be adopted." *Bd. of Penitentiary Comm'rs v. Spencer*, 159 Ky. 255, 166 S.W. 1017, 1018 (1914).

## II. STRICT SCRUTINY

This Court's strict scrutiny review involves a three-step inquiry: "First, does a statute pose a significant burden on a constitutional right? Secondly, does the statute further [a] compell[ing] state interest? Thirdly, if so, does the statute further that interest too broadly, or in the alternative is the statute narrowly tailored to protect that interest?" *Associated Indus. of Ky. v. Commonwealth*, 912 S.W.2d 947, 953 (Ky.1995) (*citing Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)).

### A. Significant Burden on a Constitutional Right

Under the first prong of this inquiry, we ask whether KRS 189.820 significantly burdens Appellants' constitutional rights. As a threshold matter, when the free exercise of religion is at issue, courts generally require a showing that the statute's challengers have a "sincerely held religious belief." *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 209, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("The State stipulated that respondents' religious beliefs were sincere"); *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir.2004) ("In analyzing [whether a state law infringes on the Appellant's free-exercise right], we consider first the threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief ....' ") (citation omitted); *DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir.2000) ("[I]f a prisoner's request for a particular diet is *not* the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request....."). "Thus, for a burden on religion to be substantial, the government regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution or adherent is insufficient." *Lyster v. Woodford Cnty. Bd. of Adjustment Members*, No. 2005–CA–001336–MR, 2007 WL 542719, *4 (Ky.App. Feb. 23, 2007) (*citing Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir.1996)).

Whether a religious belief is sincerely held is a factual determination. As such, the trial court is in the best position to determine whether a belief is, in fact, sincerely held, and we should accept the trial court's determination unless it is clearly erroneous. *Gen. Motors Corp. v. Herald*, 833 S.W.2d 804, 806 (Ky.1992) ("This Court in its appellate capacity is bound by the trial court's finding of fact unless there is clear error...."). *See also Murphy*, 372 F.3d at 983 ("Whether or not group worship is a sincerely held religious belief is a factual determination....").

The trial court in Appellants Gingerich, Yoder, and Zook's cases affirmatively found that they "do hold genuine and sincere religious beliefs, and based on their

indoctrination and up-bringing, have a genuine fear of shunning or banishment from their Church and immediate communities if they obey the law of the state and violate the rule of the church."[9] Although it is unclear whether any affirmative finding of fact was entered with respect to the Appellants in the second case, I will assume that they have an identical sincerely held religious belief as the Appellants in the first case. Indeed, one of the Appellants from the first case was also a defendant in the second case.

The finding that Appellants have a sincerely held religious belief is not clearly erroneous. The record establishes the following: that the Swartzentruber Amish shun the display of worldly symbols due to the Bible's admonition to "be not conformed to this world"; to them, the SMV emblem is a worldly symbol irrespective of the purpose for which it was created; they are prohibited by their religious code of conduct from displaying the orange-red triangle on their horse-drawn buggies because of its worldly garish colors and its function as a secular symbol; and failure to comply with this religious mandate will result in their (and their families) being shunned from the religious community. Accordingly, I conclude that Appellants have established their burden of showing a sincerely held religious belief.

Second, based on the same evidence, I conclude that compliance with KRS 189.820 significantly burdens Appellants' sincerely held religious beliefs. Accordingly, Appellants have satisfied the first prong of the test by showing KRS 189.820 imposes a significant burden on their fundamental constitutional right to the free exercise of religion. The statute is therefore presumptively unconstitutional. *See Harris v. McRae*, 448 U.S. 297, 312, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (citation and internal quotation marks omitted) ("It is well settled that ... if a law impinges upon a fundamental right explicitly or implicitly secured by the Constitution [it] is presumptively unconstitutional.").

## B. Compelling State Interest

Because Appellants satisfied the first prong of the test, the burden shifts to the Commonwealth to prove that KRS 189.820 furthers a compelling state interest. The trial court found a compelling interest "in promoting highway safety for all." The Commonwealth echoes this interest and asserts an additional, more specific interest "in placing highly-visible materials on the rear ends of buggies to prevent daytime accidents."

In support of its argument, the Commonwealth cites two studies. Both studies demonstrate that there is a serious, life-threatening problem of slow-moving vehicle crashes. *See* P.M. Garvey, *Motorist Comprehension of the Slow–Moving Vehicle (SMV) Emblem*, 9(2) J. Agric. Safety & Health 159 (2003); Cory Alexander Anderson, Causative Factors of Crashes between a Motor Vehicle and the Amish and Old Order Mennonite Horse and Buggy (2008) (unpublished Masters thesis in Urban and Regional Planning at Virginia Commonwealth University).

The Garvey study illustrates generally the problem with slow-moving vehicles. For example, "when a vehicle travelling at 55 mph is 500 ft behind a vehicle travelling at 45 mph, the time to contact between the two vehicles is 34 sec[onds]. However, if

9. Although the trial court included this finding in its "Conclusions of Law" section, whether one has a sincerely held religious belief is obviously a factual determination. I assume the trial court included this finding in its "Conclusions of Law" because the sincerity of the belief is inextricably connected to whether compliance of the law at issue would impose a substantial burden upon the exercise of those beliefs, which is a matter of law.

the lead vehicle is travelling at 25 mph, [time to contact] reduces to 11.2 sec[onds], and if the lead vehicle's speed is 5 mph, as with horse-drawn vehicles, [time to contact] falls to 6.8 seconds." Garvey, *supra,* at 159.

The Anderson study focused on the seventy-six motor-vehicle-to-buggy crashes in Pennsylvania in 2006. See Anderson, *supra,* at 1. However, it cited other studies, one of which found that in 43% of reported crashes the buggies "sustained extensive damage or were destroyed, and about 10% . . . involved a fatality." *Id.* at 2. Another study cited by Anderson found that "buggy crashes with motor vehicles constituted the second highest reason for Amish admissions to the hospital." *Id.* at 2–3. Citing an Ohio Department of Transportation study of 575 buggy crashes over a seven-year period, "the top causative factor to crashes was motor vehicles 'following too close,' . . . that rear end crashes were the most common, and that a majority of crashes occurred during daylight hours." *Id.* at 4.

I believe the Commonwealth has satisfied its burden of proving it has a compelling interest in promoting highway safety for all, and specifically in ensuring the visibility of slow-moving vehicles. I would therefore conclude that the Commonwealth satisfied the second prong of the test.

## C. Narrowly Tailored/Least Restrictive Alternative

Having established a compelling state interest, the Commonwealth must finally show that use of this particular SMV em-

blem is narrowly tailored to achieving that interest. See *Associated Indus. of Ky.,* 912 S.W.2d at 953 (*citing Buckley,* 424 U.S. 1, 96 S.Ct. 612 (1976)). Although not necessarily identical to the notion of "narrow tailoring," the United States Supreme Court, analyzing a similar state-law-infringement on the free exercise of religion, defined this third prong of the test as requiring the state to show that its means are "the *least restrictive* means of achieving" its compelling interest. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (emphasis added); *see also Emp't Div., Dep't of Human Res. v. Smith,* 494 U.S. 872, 899, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), *superseded by statute.* Indeed, this is the test that is specifically defined in the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb–1 (2012), and appears to be the test that most states employ for free exercise issues challenged on state law grounds.[10] As this "least restrictive alternative" test is a less nebulous and arbitrary determination—and the test the Commonwealth, Appellants, the courts below, the federal courts and most states use for free exercise issues—I would require the Commonwealth to prove the *absence* of a less restrictive alternative (notwithstanding our *Associated Industries,* 912 S.W.2d at 953, formulation).

The Commonwealth contends that the fluorescent-colored triangle is the least restrictive means of ensuring driver safety. However, twenty-three states and the District of Columbia do not require animal-drawn vehicles to display the SMV triangle mandated by KRS 189.820.[11] In these oth-

10. *See, e.g., Humphrey v. Lane,* 89 Ohio St.3d 62, 728 N.E.2d 1039, 1040 (2000); *Munns v. Martin,* 131 Wash.2d 192, 930 P.2d 318, 321 (1997) (en banc); *Miller,* 549 N.W.2d at 241.

11. See Ariz.Rev.Stat. Ann. § 28–937 (Arizona); Ark.Code Ann. § 27–36–219 (Arkansas); Conn. Gen.Stat. Ann. § 14–96n (Connecticut); 21 Del.Code Ann. tit. 21, § 4345 (Delaware); D.C. Mun. Regs. tit. 18, § 739 (SMV emblem requirement applies only to

er jurisdictions, various uses of white and red lanterns on back and/or front of animal-drawn vehicles is required. *See, e.g.,* Ariz.Rev.Stat. Ann. § 28–937; Ark.Code Ann. § 27–36–219. Other jurisdictions mandate the additional requirement of red reflectors. *See, e.g.,* Conn. Gen.Stat. Ann. § 14–96n. Still others permit those with objection to the SMV triangle to use a certain amount of reflective tape. *See, e.g.,* Iowa Admin. Code § 761–452.3(321) (permitting the use of at least seventy-two inches of black, gray, silver, or white reflective material as alternative to emblem).

Clearly, at least some of these alternatives to the SMV emblem required by KRS 189.820 are less restrictive on Appellants' freedom to exercise religion according to the dictates of their consciences. Whether the SMV emblem is *more effective* than these alternatives is irrelevant so long as the alternatives are *viable.* Of course, "[t]o be a 'less restrictive alternative,' [the alternative] must be both less restrictive in the sense that it inhibits [the free exercise of religion] to a lesser degree and it must be a viable alternative in that it allows the Government to achieve the ends that are its compelling interest." *Playboy Entm't Grp., Inc. v. United States,* 30 F.Supp.2d 702, 717 (D.Del.1998).

I believe that there are viable, less restrictive alternatives to the SMV emblem.

For example, Appellants testified that they were using a plausible alternative to the SMV emblem in the form of over one hundred square inches of gray reflective tape, plus lanterns at nighttime. The Appellants' expert witness, a highway safety expert with specific expertise in Amish buggy safety, testified that the reflective tape/lantern combination used by Appellants is a viable alternative to the SMV emblem and one that is used in several other jurisdictions. Additionally, the alternative slow-moving vehicle requirements in other states all appear to be both viable and less restrictive than the SMV emblem required by KRS 189.820. *See supra* note 4.

In fact, since Appellants' convictions, Kentucky has joined these states in finding an effective way to advance roadway safety with respect to slow moving vehicles in a manner that does not interfere with the Swartzentruber Amish's beliefs. Effective April 11, 2012, the General Assembly modified KRS 189.820 to add subsection (4) which allows use of reflective tape instead of the SMV triangle.[12] Thus, Kentucky's

motor vehicles), D.C.Code § 8–2006 (animal-drawn vehicles in the "horse-drawn carriage trade" required to display SMV emblem) (District of Columbia); Iowa Admin. Code § 761–452.3(321) (Iowa); Me.Rev.Stat. Ann. tit. 29, § 1925 (Maine); Mich. Comp. Laws Ann. § 257.688 (Michigan) (although § 257.688(g) would require the SMV emblem, Appellants brief indicates that after *Michigan v. Swartzentruber,* 170 Mich.App. 682, 429 N.W.2d 225 (1988), horse-drawn buggies driven by Amish may display reflector tape and red lanterns); *State v. Hershberger,* 462 N.W.2d 393 (Minn.1990) (Minnesota); Miss.Code Ann. § 63–7–91 (Mississippi); N.J. Stat. Ann. § 39:4–25 (New Jersey); N.M. Stat. Ann. § 66–3–887 (New Mexico); N.Y. Comp.Codes R. & Regs. tit. 15, § 68.8(c) (New York); (no applicable law) (North Carolina); N.D. Cent.

Code Ann. §§ 39–21–50 and 39–21–16 (North Dakota); Ohio Rev.Code Ann. § 4513.11, Ohio Admin. Code 4501–39–03 (Ohio); R.I. Gen. Laws Ann. §§ 31–23–47 and 31–24–35 (Rhode Island); S.C.Code Ann. § 56–5–4650 (South Carolina); Tenn.Code Ann. § 55–9–401 (Tennessee); Vt. Stat. Ann. tit. 23, § 1361 (Vermont); W. Va.Code Ann. §§ 17C–15–16, 17C–15–2 (West Virginia); Wis. Stat. Ann. § 347.245 held unconstitutional as applied to Old Order Amish by *State v. Miller,* 196 Wis.2d 238, 538 N.W.2d 573 (Wis.App.1995); according to Appellants' brief, the use of white reflective tape and a lantern may be used as an alternative safety measure (Wisconsin); Wyo. Stat. Ann. § 31–5–921 (Wyoming).

**12.** KRS 189.820(4) provides:

own legislature has found an acceptable, less restrictive alternative to address its roadway safety concerns. Accordingly, I believe that the Commonwealth failed to satisfy its burden of proving that the SMV emblem is the least restrictive alternative to achieving its compelling interest.

## III. CONCLUSION

In light of the foregoing, I would hold that strict scrutiny applies to laws infringing upon the free exercise of religion under Sections 1 and 5 of Kentucky's Constitution. Applying strict scrutiny, I would hold that: (1) Appellants have satisfied their requirement of establishing a sincerely-held religious belief, and that KRS 189.820 significantly burdens their constitutional rights; (2) the Commonwealth has a compelling interest in highway safety for all, and specifically in ensuring the visibility of slow-moving vehicles; and (3) the Commonwealth failed to prove that requiring the display of the SMV emblem is the least restrictive alternative to achieving that interest. I would therefore hold KRS 189.820 unconstitutional as applied to the Swartzentruber Amish, and reverse the judgment of the Court of Appeals. Abramson, J., joins.

As an alternative to the slow-moving vehicle emblem, one (1)-inch-wide white or silver reflective tape may be used on motorless slow-moving vehicles as follows:

(a) The rear of the vehicle shall be covered with a minimum of one hundred (100) square inches of the reflective tape;

(b) The reflective tape on the rear of the vehicle shall, at a minimum, outline the entire rear of the vehicle;

(c) Each side of the vehicle shall be covered with a minimum of thirty-six (36) square inches of reflective tape; and

(d) The highest point of the left front of the vehicle shall be covered with a minimum of twenty-four (24) square inches of reflective tape.